## LEASE

THIS LEASE ("Lease") entered into as of the __1st__ day of June, 2006, between **MONARCH HOLDINGS, L.L.C.,** a Limited Liability Company of the State of New Jersey, with an address of 365-B New Albany Road, Moorestown, New Jersey, 08057-1117 ("Landlord"), and **RELIANCE FUNDING SERVICES, INC.,** a Corporation of the State of New Jersey, with Corporate Headquarters ~~currently~~ at 1101 North Kings Highway, Suite G100, Cherry Hill, New Jersey, 08034, ~~but which will change,~~ upon occupancy of the Leased Premises, with an additional office location at 1000 Crawford Place, Suite 360, Mt. Laurel, New Jersey, 08054 ("Tenant").

## WITNESSETH

In consideration of the mutual covenants herein set forth, and intending to be legally bound, the parties hereto covenant and agree as follows:

1.  **SUMMARY OF TERMS.**

The following terms, as used in this Lease, shall have the meanings and shall be construed as set forth below:

(a)  "Building": The Building located at 1000 Crawford Place, Mt. Laurel, New Jersey, 08054;

(b)  "Project": The Building, the land and all other improvements located at 1000 Crawford Place, Mt. Laurel, New Jersey, 08054;

(c)  "Leased Premises": the parties stipulate and agree that there is **2,281** rentable square feet, being a portion of the 3rd floor of the Building, being Suite 360 as shown on the plan attached hereto as Exhibit "A" and made a part hereof;

(d)  "Term": For a Term of **60 months (totaling 5 years)** beginning on July 1, 2006 (the "Commencement Date") and ending on June 30, 2011 (the "Termination Date"), to be continuously used and occupied during the term of this Lease by the Tenant.

(e)  "Base Rent":

| LEASE PERIOD | YEAR | PER S.F. | MONTHLY TOTAL | ANNUAL TOTAL |
|---|---|---|---|---|
| 07/01/06-06/30/07 | #1 | $21.00 | $3,991.75 | $47,901.00 |
| 07/01/07-06/30/08 | #2 | $22.00 | $4,181.83 | $50,182.00 |
| 07/01/08-06/30/09 | #3 | $23.00 | $4,371.92 | $52,463.00 |
| 07/01/09-06/30/10 | #4 | $23.50 | $4,466.96 | $53,603.50 |
| 07/01/10-06/30/11 | #5 | $23.50 | $4,466.96 | $53,603.50 |

Plus janitorial covering the Tenant's individual leased space if the Tenant elects to contract with the Landlord to provide this service; or Tenant, at Tenant's expense, may secure the services of an approved outside vendor [See Item 6(B)(b)].

INITIALS:
LANDLORD
TENANT

4

**EXHIBIT**
**1**

(f)     "Security Deposit": $8,592.00 (2 Month's Average Rent)

(g)     "Estimated Occupancy Date": On Or About June 23, 2006

(h)     "Tenant's Allocated Share": 5.782%;

     "Base Year": 2006

(i)     "Renewal Option(s)": None

(j)     "Rentable Area": Percentage of Entire Building of 5.782%
     Rentable Area includes Tenant's pro rata share of the common areas of the
building.

(k)     "Permitted Uses": Tenant's use of the Leased Premises shall be limited to
general office use, which includes mortgage broker services and storage incidental thereto.
Tenant's rights to use the Leased Premises shall be subject to all applicable laws and governmental
rules and regulations and to all reasonable requirements of the Building Owner. Landlord represents
and warrants to Tenant that such use is permitted at the Leased Premises under applicable zoning and
other municipal ordinances applicable to the Leased Premises.

(l)     "Brokers":
Stevens & Stevens, Inc.
365-B New Albany Road
Moorestown, New Jersey 08057-1117
Telephone: (856) 222-1000
Fax: 856-222-9855
&
NAI Mertz Corporation
21 Roland Avenue
Mt. Laurel, New Jersey 08054-1096
Telephone: (856) 234-9600
Fax: 856-234-4957

(m)     "Notice Address & Name of Contact"
**Tenant:** (Main Notice Address)
Reliance Funding Services, Inc.
Attn.: Mr. Eric Cohen
1000 Crawford Place, Suite 360
Mt. Laurel, New Jersey 08054
Telephone: (866) 882-7262
Fax: 856-755-1231
E-Mail:

Tenant (With A Copy To):
Reliance Funding Services, Inc.
Attn.: Mr. Steve Palo
1101 N. Kings Hwy.,Ste.G100
Cherry Hill, NJ 08034
Telephone: (866) 882-7262
Fax: 856-755-1231
E-Mail:

INITIALS:
LANDLORD
TENANT

5

Landlord:
Monarch Holdings, L.L.C.
Attn.: Warren W. Stevens
365-B New Albany Road
Moorestown, New Jersey 08057-1117
Telephone: (856) 222-1000 ·
Fax: 856-222-9855

With a Copy to:
Timothy A. Stevens
13 Chatham Drive
Voorhees, NJ 08043
Telephone: (856) 222-1000
Fax: 856-222-9855

(n)     Tenant's "North American Industry Classification System Number": NAICS
# 522310 ("Mortgage and Nonmortgage Loan Brokers"). The NAICS System is the System
currently in use.

(o)     "Additional Rent": All sums of money or charges required to be paid by
Tenant under this Lease other than Base Rent, whether or not such sums or charges are designated as
"Additional Rent".

(p)     "Rent": All Annual Base Rent, monthly installments of Annual Base Rent,
Base Rent and Additional Rent payable by Tenant to Landlord under this Lease.

2.     **LEASED PREMISES**.

Landlord does hereby lease, demise and let unto Tenant and Tenant does hereby hire and
lease from Landlord the Leased Premises for the Term, upon the terms, provisions, conditions and
limitations set forth herein.

3.     **TERM**.

(a)     The Term of this Lease shall commence (the "Commencement Date") the
date which is the earlier of (i) when Tenant, with Landlord's prior consent, assumes possession of the
Leased Premises for its Permitted Uses, or (ii) seven (7) days after Tenant's receipt of notice from
Landlord of substantial completion of the improvements required to be made by Landlord, if any.
Notwithstanding the foregoing, in no event will the Commencement Date be earlier than **July 1,
2006**. The Leased Premises shall be deemed "substantially completed" when the improvements
INITIALS:
LANDLORD TAS
TENANT EC

6

called for have been completed to the extent that the Leased Premises may be occupied by Tenant for its Permitted Uses, subject only to completion of minor finishing, adjustment of equipment, and other minor construction aspects and, if required, a temporary or permanent certificate of occupancy permitting the occupancy of the Leased Premises has been issued. The Term shall expire on the last day of the month as set forth in Article 1(d), which is sixty (60) months from the Commencement Date. If the Commencement Date is different from the date set forth herein, the Commencement Date and Expiration Date shall be confirmed by Landlord and Tenant by execution of a Lease Modification Agreement in the form attached hereto as Exhibit "B" and the Expiration Date shall be the last day of the month in which the 60-month anniversary of the day immediately preceding the Commencement Date occurs. If Tenant fails to execute or objects to the Lease Modification Agreement within ten (10) business days of its delivery, Landlord's determination of such dates shall be deemed accepted.

     (b)     Upon notification by Landlord, Landlord and Tenant shall schedule a pre-occupancy inspection of the Leased Premises at which time a punch list of outstanding items, if any, shall be completed. Within thirty (30) days thereafter, Landlord shall complete the punch list items.

     (c)     In the event that the Leased Premises are not ready for Tenant's occupancy at the time herein fixed for the beginning of the Term of this Lease because of a delay in completion of Landlord's Work, if any (unless such alterations are being done by Tenant or Tenant's contractor, in which case there shall be no suspension or proration of rental or other sums), or because of any restrictions, limitations or delays caused by government regulations or governmental agencies, this Lease and the Term hereof shall not be affected thereby, nor shall Tenant be entitled to make any claim for or receive any damages whatsoever from Landlord; provided, however, no rent or other sums to be paid by Tenant shall become due until the Leased Premises are substantially completed and deemed by Landlord to be ready for Tenant's occupancy, and until that time, the rent and other sums due hereunder shall be suspended.

    4.     **CONSTRUCTION BY TENANT.**

     **Landlord agrees to substantially complete certain changes and improvements in and about the premises prior to the Tenant taking occupancy. Said improvements are detailed on Exhibits "A" and "A-1" attached hereto and made a part hereof.**

    5.     **BASE RENT; SECURITY DEPOSIT.**

     (a)     Tenant shall pay to Landlord without notice or demand, and without set-off, the annual Base Rent payable in the monthly installments of Base Rent as set forth in Article 1(e), in advance on the first day of each calendar month during the Term by good funds delivered to Monarch Holdings, L.L.C. (Landlord) at 365-B New Albany Road, Moorestown, New Jersey, 08057-1117. Notwithstanding the immediately preceding sentence, the first full month's installment and the Security Deposit shall be paid upon the execution of this Lease by Tenant.

     (b)     In the event any Base Rent or Additional Rent, charge, fee or other amount due from Tenant under the terms of this Lease are not paid to Landlord within ten (10) days after due, Tenant shall also pay as Additional Rent a service and handling charge equal to ten (10%) percent of

INITIALS:
LANDLORD TAS
TENANT EC

the total payment then due. The aforesaid late fee shall begin to accrue on the initial date of a payment due date, irrespective of any grace period granted hereunder. This provision shall not prevent Landlord from exercising any other remedy herein provided or otherwise available at law or in equity in the event of any default by Tenant.

Tenant shall be required to pay a Security Deposit, as set forth in Article 1(f), of $8,592.00 under this Lease as security for the prompt, full and faithful performance by Tenant of each and every provision of this Lease and of all obligations of Tenant hereunder. No interest shall be paid to Tenant on the Security Deposit, and Landlord shall have the right to commingle the Security Deposit with other Landlord funds. If Tenant fails to perform any of its obligations hereunder, before the expiration of any applicable grace, notice or cure period, Landlord may use, apply or retain the whole or any part of the Security Deposit for the payment of (i) any rent or other sums of money which Tenant may not have paid when due, (ii) any sum expended by Landlord on Tenant's behalf in accordance with the provisions of this Lease, and/or (iii) any sum which Landlord may expend or be required to expend by reason of Tenant's default, including, without limitation, any damage or deficiency in or from the reletting of the Leased Premises as provided in this Lease. The use, application or retention of the Security Deposit, or any portion thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by law (it being intended that Landlord shall not first be required to proceed against the Security Deposit) and shall not operate as either liquidated damages or as a limitation on any recovery to which Landlord may otherwise be entitled. If any portion of the Security Deposit is used, applied or retained by Landlord for the purposes set forth above, Tenant agrees, within ten (10) days after the written demand therefor is made by Landlord, to deposit good funds with the Landlord in an amount sufficient to restore the Security Deposit to its original amount. In addition to the foregoing, if Tenant defaults (irrespective of the fact that Tenant cured such default) more than once in its performance of a monetary obligation and such monetary defaults aggregate in excess of $10,000.00 under this Lease, Landlord may require Tenant to increase the Security Deposit to the greater of three (3) times the (i) Base Rent paid monthly, or (ii) the initial amount of the Security Deposit.

If Tenant shall fully and faithfully comply with all of the provisions of this Lease, the Security Deposit, or any balance thereof, shall be returned to Tenant without interest within thirty (30) days after the expiration of the Term or upon any later date after which Tenant has vacated the Leased Premises. In the absence of evidence satisfactory to Landlord of any permitted assignment of the right to receive the Security Deposit, Landlord may return same to the original Tenant, regardless of one or more assignments of Tenant's interest in this Lease or the Security Deposit. Upon the return of the Security Deposit, or the remaining balance thereof, to the original Tenant or any successor to the original Tenant, Landlord shall be completely relieved of liability with respect to the Security Deposit.

In the event of a transfer of the Project or the Building, Landlord shall have the right to transfer the Security Deposit to the Buyer and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit. Upon the assumption of such Security

INITIALS:
LANDLORD AS
TENANT EC

8

Deposit by the Buyer, Tenant agrees to look solely to the new landlord for the return of said Security Deposit, and the provisions hereof apply to every transfer or assignment made of the Security Deposit to a new landlord. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the Security Deposit and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. The Security Deposit shall not be mortgaged, assigned or encumbered in any manner whatsoever by Tenant without the prior written consent of Landlord.

6.   **ADDITIONAL RENT.**
   (A)   Commencing January 1st of the first full calendar year after the Commencement Date, and in each calendar year thereafter during the Term (as same may be extended), Tenant shall pay to Landlord Tenant's Allocated Share of the following charges ("Expenses"), without deduction or setoff, to the extent such Expenses exceed the Expenses in the Base Year.

   Operating Expenses. All costs and expenses related to the Project incurred by Landlord, including, but not limited to:
   (a)   All costs and expenses related to the operation of the Building and Project including, but not limited to, lighting, cleaning the Building exterior and common areas of the Building interior, trash removal and recycling, repairs and maintenance of the roof and storm water management system, fire suppression and alarm systems, utilities, elevator maintenance and inspection, removing snow, ice and debris and maintaining all landscape areas, (including replacing and replanting flowers, shrubbery and trees), maintaining and repairing all other exterior improvements on the Project, all repairs and compliance costs necessitated by laws enacted or which become effective after the date hereof including, without limitation, any additional regulations or requirements enacted after the date hereof regarding the Americans With Disabilities Act (as such applies to the Project or common areas but not to any individual tenant's space, if applicable) required of Landlord under applicable laws and rules and regulations.
   (b)   All costs and expenses incurred by Landlord for environmental testing, sampling or monitoring required by statute, regulation or order of governmental authority, except any costs or expenses incurred in conjunction with the spilling or depositing of any hazardous substance for which any person or other tenant is legally liable and Landlord is reimbursed for by such other person.
   (c)   Any other expense or charge (including reasonably allocated general and administrative charges), which would typically be considered an expense of maintaining, operating or repairing the Project under generally accepted accounting principles.
   (d)   Management fee not to exceed five (5%) percent of the Gross Rent. It is expressly understood that legal fees incurred in an action against an individual tenant shall not be deemed includable as an operating expense pursuant to this provision.
   (e)   Capital expenditures and capital repairs and replacements shall be included as Operating Expenses solely to the extent of (a) those which under generally applied accounting practices consistently applied are expenses or regarded as deferred expenses or are made

INITIALS:
LANDLORD
TENANT

9

by reason of legal requirements enacted or adopted after the date hereof, in any of which cases the cost thereof shall be in included in Operating Expenses for the calendar year in which the costs are incurred and subsequent calendar years, on a straight-line basis, to the extent that such items are amortized over an appropriate period in accordance with generally accepted accounting practices consistently applied, (b) the cost of any item of capital equipment purchased by Landlord or any capital expenditure made by Landlord which has the effect of reducing the expenses which would otherwise be included in Operating Expenses, in any of which cases the cost of such capital equipment or capital expenditure shall be included in Operating Expenses for the calendar year in which the costs are incurred and subsequent calendar years, on a straight-line basis, the extent that such items are amortized over such period of time as such savings or reductions in Operating Expenses are expected to equal Landlord's costs for such capital equipment or capital expenditure, determined in accordance with generally accepted accounting practices consistently applied (provided, however, in no event shall the amount so included in Operating Expenses exceed the reasonably anticipated amount of savings during any particular period), and (c) if Landlord shall lease any items of capital equipment designed to result in savings or reductions in expenses which would otherwise be included in Operating Expenses, then the rentals and other costs paid pursuant to such leasing will be included in Operating Expenses for the calendar year in which such rentals or other costs were incurred (provided, however, in no event shall the amount of such rentals or other costs so included in Operating Expenses exceed the reasonably anticipated amount of savings during any particular period).

   (f) All insurance premiums paid or payable by Landlord for insurance with respect to the Project as follows: (a) fire and extended coverage insurance (including demolition and debris removal); (b) insurance against Landlord's rental loss or abatement (but not including business interruption coverage on behalf of Tenant), from damage or destruction from environmental hazards, fire or other casualty; (c) Landlord's commercial general liability insurance (including bodily injury and property damage); and (d) such other insurance as Landlord or any reputable mortgage lending institution holding a mortgage on the Leased Premises may require. If the coverage period of any of such insurance obtained by Landlord commences before or extends beyond the Term, the premium therefore shall be prorated to the Term. If any such insurance is provided by blanket coverage, the part of the premium allocated to the Project shall be equitably determined by Landlord but shall not exceed the amount of premium due if insurance was provided by a policy only insuring the Project. Should Tenant's occupancy or use of the Leased Premises at any time change and thereby cause an increase in such insurance premiums on the Leased Premises, Building and/or Project, Tenant shall pay to Landlord the entire amount of such reasonably documented increase.

   (g) Taxes shall be defined as all taxes, assessments and other governmental charges ("Taxes"), including special assessments for public improvements or traffic districts which are levied or assessed against the Project during the Term or, if levied or assessed prior to the Term, which properly are allocable to the Term, and real estate tax appeal expenditures incurred by Landlord to the extent of any reduction resulting thereby. Nothing herein contained shall be construed to include as Taxes: (A) any inheritance, estate, succession, transfer, gift, franchise,

INITIALS:
LANDLORD TAC
TENANT EC

10

corporation, net income or profit tax or capital levy that is or may be imposed upon Landlord; or (B) any transfer tax or recording charge resulting from a transfer of the Building or the Project; provided, however, that if at any time during the Term the method of taxation prevailing at the commencement of the Term shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes now levied, assessed or imposed on real estate as such there shall be levied, assessed or imposed (i) a tax on the rents received from such real estate, or (ii) a license fee measured by the rents receivable by Landlord from the Leased Premises or any portion thereof, or (iii) a tax or license fee imposed upon Leased Premises or any portion thereof, then the same shall be included in the computation of Taxes hereunder.

Notwithstanding the foregoing, the term "Operating Expenses" shall not include any of the following:

(a)     Repairs or other work occasioned by fire, windstorm or other insured casualty or by the exercise of the right of eminent domain to the extent of insurance proceeds or condemnation awards received therefor;

(b)     Leasing commissions, accountants', consultants', auditors' or attorneys' fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with other tenants or prospective tenants or other occupants, or associated with the enforcement of any other leases or the defense of Landlord's title to or interest in the real property or any part thereof;

(c)     Costs incurred by Landlord in connection with construction of the Building and related facilities, the correction of latent defects in construction of the Building or the discharge of Landlord's Work;

(d)     Costs (including permit, licenses and inspection fees) incurred in renovating or otherwise improving or decorating, painting, or redecorating the Building or space for other tenants or other occupants or vacant space;

(e)     Depreciation and amortization;

(f)     Costs incurred due to a breach by Landlord or any other tenant of the terms and conditions of any lease;

(g).    Overhead and profit increment paid to subsidiaries or affiliates of Landlord for management or other services on or to the Building or for supplies, utilities or other materials, to the extent that the costs of such services, supplies, utilities or materials exceed the reasonable costs that would have been paid had the services, supplies or materials been provided by unaffiliated parties on a reasonable basis without taking into effect volume discounts or rebates offered to Landlord as a portfolio purchaser;

(h)     Interest on debt or amortization payments on any mortgage or deeds of trust or any other borrowings and any ground rent;

(i)     Brokerage commissions;

(j)     Financing or refinancing costs;

(k)     The cost of any work or services performed for any tenant(s) of the Building (including Tenant), whether at the expense of Landlord or such tenant(s), to the extent that

INITIALS:
LANDLORD
TENANT

11

such work or services are in excess of the work or services which Landlord, at its expense, is required to furnish Tenant under this Lease;

        (l)    Lease concessions and work letters given by Landlord to new or existing tenants or occupants in the Building;

        (m)    Expenses or costs to the extent such expenses or costs are otherwise attributable to or properly allocable to another property of Landlord;

        (n)    Costs incurred in connection with the sale or transfer of Landlord's interest;

        (o)    Overtime costs incurred as a result of another tenant,or occupant in the Building to the extent that Landlord is entitled to be directly reimbursed for the same;

        (p)    Expenses resulting from the negligence or willful misconduct of Landlord;

        (q)    Any bad debt loss, rent, loss or reserves for bad debts or rent loss;

        (r)    Fines, penalties and interest attributable to a violation by Landlord or any other tenant or occupant in the Building, or their respective agents, servants, employees, contractors, licensees or invitees;

        (s)    Any amounts for which Landlord is reimbursed by insurance;

        (t)    Costs separately billed to other tenants or occupants in the Building (other than as Operating Expenses);

        (u)    Costs separately billed to other tenants or occupants in the Building (other than as Operating Expenses);

        (v)    Costs and expenses incurred by Landlord to remove, enclose or encapsulate any asbestos or other hazardous substances;

        (w)    Lease takeover or termination costs incurred by Landlord in connection with any other lease or other agreement in the Building;

        (x)    The costs of installing an observatory, broadcast facility, telecommunications facility, theater, auditorium, luncheon club, athletic or recreational club, childcare facility, or cafeteria or finding facility;

        (y)    Costs and expenses incurred by Landlord in connection with any obligation of Landlord to indemnify another tenant or occupancy of the Building pursuant to a lease or otherwise;

        (z)    Attorneys' fees and disbursements and other costs in connection with any judgment, settlement or arbitration resulting from any tort liability on the part of Landlord and the amount of such settlement or judgment;

        (aa)    Costs of sculpture, paintings, or other objects purporting to be art;

        (bb)    Charitable and political contributions made by Landlord, and dues paid to any professional lobbying organization;

        (cc)    Any profits received by Landlord because the aggregate proportionate shares of Operating Expenses of all tenants in the Building exceed a number greater than one hundred percent (100%).

INITIALS:
LANDLORD ~~TAS~~
TENANT ~~EC~~

12

In addition, Operating Expenses shall be reduced by all cash, trade or quality discounts and any other credits, refunds and reimbursements received by Landlord in the purchase of any goods, utilities and services in connection with the operation of the Building. In calculating Operating Expenses, no expense shall be charged more than once.

(B)     Tenant shall pay, in monthly installments in advance, on account of Tenant's Allocated Share of Operating Expenses, the estimated amount of the increase of such Expenses for such year in excess of the Base Year as determined by Landlord in its reasonable discretion and as set forth in a notice to Tenant, such notice to include the basis for such calculation. Within sixty (60) days after the end of the calendar year in which the Lease commences and thereafter for each successive calendar year or part thereof, Landlord shall send to Tenant a statement of projected increases in Expenses in excess of the Base Year and shall indicate what Tenant's projected share of Expenses shall be. Said amount shall be paid in equal monthly installments in advance by Tenant as Additional Rent commencing January 1st of the applicable Lease Year.

Tenant shall have the right, at its sole cost and expense, within ninety (90) days from receipt of Landlord's statement of Expenses, to audit or have its appointed Certified Public Accountant audit Landlord's records related to Expenses provided that any such audit shall be conducted at the Landlord's management office and may not occur more frequently than once each calendar year nor apply to any year prior to the year of the statement being reviewed. Landlord shall cooperate with Tenant in connection with any such audit and provide adequate access to Landlord's records in connection therewith. In the event Tenant's audit discloses any discrepancy, Landlord and Tenant shall use their best efforts to resolve the dispute and make an appropriate adjustment, failing which, they shall submit any such dispute to arbitration pursuant to the rules and under the jurisdiction of the American Arbitration Association in Burlington County, New Jersey. The decision rendered in such arbitration shall be final, binding and non-appealable. The expenses of arbitration, other than individual legal and accounting expenses, which shall be the respective parties' responsibility, shall be divided equally between the parties.

(a)     If during the course of any Lease Year, Landlord shall have reason to believe that the Operating Expenses shall be different than that upon which the aforesaid projections were originally based, then Landlord shall be entitled to adjust the amount by reallocating the remaining payments for such year, for the months of the Lease Year which remain for the revised projections, and to advise Tenant of an adjustment in future monthly amounts to the end result that the Operating Expenses shall be collected on a reasonably current basis each Lease Year.

(b)     In calculating the Expenses as hereinbefore described, if for ninety (90) or more days during the preceding Lease Year less than ninety (90%) percent of the rentable area of the Building shall have been occupied by tenants, then the Expenses attributable to the Property shall be deemed for such Lease Year to be amounts equal to the Expenses which would normally be expected to be incurred had such occupancy of the Building been at least ninety (90%) percent throughout such year, as reasonably determined by Landlord [i.e., taking into account that certain expenses depend on occupancy (e.g., janitorial) and certain expenses do not (e.g., landscaping)]. Furthermore,

INITIALS:
LANDLORD
TENANT

13

if Landlord shall not furnish any item or items of Expenses to any portions of the Building because such portions are not occupied or because such item is not required by the tenant of such portion of the Building, for the purposes of computing Expenses, an equitable adjustment shall be made so that the item of Operating Expense in question shall be shared only by tenants actually receiving the benefits thereof. **The base year expense stop for janitorial of $1.00 per square foot is <u>not</u> included in the current monthly rate outlined in 1. (e) "Summary of Terms". (Building janitorial costs for common areas shall be included in Expenses). Tenant may use the dumpster provided for normal office trash.**

(c)　　By April 1st of each Lease Year or as soon thereafter as reasonably available, Landlord shall send to Tenant a statement of actual expenses incurred for Expenses for the prior Lease Year showing the Allocated Share due from Tenant. Landlord shall use its reasonable efforts to provide Tenant with the aforesaid statements on or before April 1st of each Lease Year; provided, however, if Landlord is unable to provide such statements by April 1st, Landlord shall not have been deemed to waive its right to collect any such amounts as Additional Rent. In the event the amount prepaid by Tenant exceeds the amount that was actually due, then Landlord shall issue a credit to Tenant in an amount equal to the overcharge, which credit Tenant may apply to future payments on account of Expenses until Tenant has been fully credited with the overcharge. If the credit due to Tenant is more than the aggregate total of future rental payments, Landlord shall pay to Tenant the difference between the credit in such aggregate total. In the event Landlord has undercharged Tenant, then Landlord shall send Tenant an invoice with the additional amount due, which amount shall be paid in full by Tenant within twenty (20) days of receipt. After thirty (30) days, the aforesaid invoiced balance due shall accrue at an interest rate of one-and one-half (1-1/2%) percent per month.

(d)　　Each of the Operating Expense amounts, whether requiring lump sum payment or constituting projected monthly amounts added to the Base Rent shall, for all purposes, be treated and considered as Additional Rent and the failure of Tenant to pay the same, after being notified of the amount thereof, as and when due in advance and without demand shall have the same effect as failure to pay any installment of the Base Rent and shall, upon the expiration of any applicable grace, notice or cure period, afford Landlord all the remedies in the Lease therefor as well as at law or in equity.

(e)　　If this Lease terminates other than at the end of a calendar year, Landlord's annual estimate of Expenses shall be accepted by the parties as the actual Expenses for the year the Lease ends unless Landlord provides Tenant with actual statements in accordance with subsection 6(c) above and said amount shall be prorated for the period of Tenant's occupancy.

7.　　<u>ELECTRICITY CHARGES.</u>

Landlord shall not be liable for any interruption or delay in electric or any other utility service for any reason unless caused by the gross negligence or willful misconduct of Landlord or its agents. Landlord shall have the right to change the electric and other utility providers to the Project or Building at any time. Tenant shall pay to Landlord, as Additional Rent, within thirty (30) business days of receipt of Landlord's billing statement therefor, all charges incurred by Landlord, or its agent,

INITIALS:
LANDLORD
TENANT

14

for electricity, such charges to be based upon Tenant's Allocated Share. The aforesaid electricity charges shall commence upon occupancy by Tenant of the Leased Premises. As long as Tenant is not in default under any covenants of this Lease, Landlord, during the hours of 8:00 A.M. to 6:00 P.M. on weekdays and on Saturdays from 8:00 A.M. to 1:00 P.M. ("Working Hours"), excluding legal holidays, shall furnish the Leased Premises with heat and air conditioning in accordance with federal standards in the respective seasons, and provide, on a 24-hour per day, seven-day-per week basis, the Leased Premises with electricity adequate for lighting and usual office equipment. At any hours other than Working Hours, if requested by Tenant, Landlord will provide such heat and air conditioning at Tenant's expense at $75.00 per hour or fraction thereof so requested by Tenant. Notwithstanding anything herein to the contrary, if Landlord reasonably determines that Tenant's use of electricity is excessive, Tenant agrees to pay for the installation of a separate electric meter to measure electrical usage in excess of normal office use and Tenant shall pay Landlord for all such excess electricity registered in such submeter, at the rate paid by Landlord for electricity for the Building.

8.   **SIGNS; USE OF LEASED PREMISES AND COMMON AREAS.**
    (a) Landlord shall provide Tenant, as part of the Tenant Allowance, standard identification signage on the Building directory. No other signs shall be placed, erected or maintained by Tenant at any place upon the Leased Premises, Building or Project. Notwithstanding the foregoing, Tenant may, at Tenant's expense, have identification signage vinyl lettered on the standard sign panel provided by Landlord adjacent to or applied to the door of the Leased Premises.
    (b) Tenant may use and occupy the Leased Premises only for the express and limited purposes stated in Article 1(k) above; and the Leased Premises shall not be used or occupied, in whole or in part, for any other purpose without the prior written consent of Landlord; provided that Tenant's right to so use and occupy the Leased Premises shall remain expressly subject to the provisions of "Governmental Regulations", Article 26 herein. No machinery or equipment shall be permitted that shall cause vibration, noise or disturbance beyond the Leased Premises. Tenant, without Landlord's consent or direction, shall not "vacate" the Leased Premises at any time during the Term, nor permit the Leased Premises to remain unoccupied. "Vacate" shall be defined as Tenant's ceasing to use the Leased Premises for its Permitted Use or the removal of substantially all of its furniture and equipment and personal property from the Leased Premises. If Tenant shall vacate the Leased Premises, the entire rent or amount for the balance of the Lease Term shall become due and payable.
    (c) Tenant shall not overload any floor or part thereof in the Leased Premises or the Building, including any public corridors or elevators therein, bringing in, placing, storing, installing or removing any large or heavy articles, and Landlord may prohibit, or may direct and control the location and size of, safes and all other heavy articles, and may require, at Tenant's sole cost and expense, supplementary supports of such material and dimensions as Landlord may deem necessary to properly distribute the weight.
    (d) Tenant shall not install in or for the Leased Premises, without Landlord's prior written approval, any equipment which requires more electric current than Landlord is required to

INITIALS:
LANDLORD 
TENANT  EG

15

provide under this Lease, and Tenant shall ascertain from Landlord the maximum amount of load or demand for or use of electrical current which can safely be permitted in and for the Leased Premises, taking into account the capacity of electric wiring in the Building and the Leased Premises and the needs of Building common areas (interior and exterior) and the requirements of other tenants of the Building, Tenant and shall not in any event connect a greater load than such safe capacity.

(e) Tenant shall not commit or suffer any waste upon the Leased Premises, Building or Project or any nuisance, or do any other act or thing which may disturb the quiet enjoyment of any other tenant in the Building or Project.

(f) Tenant shall have the right, non-exclusive and in common with others, to use the exterior paved driveways and walkways of the Building for vehicular and pedestrian access to the Building. Tenant shall also have the right, in common with other tenants of the Building and Landlord, to use the designated parking areas of the Project for the parking of automobiles of Tenant and its employees and business visitors, incident to Tenant's permitted use of the Leased Premises; provided that Landlord shall have the right to restrict or limit Tenant's utilization of the parking areas to **four (4) automobiles per 1,000 square feet of Leased Premises (or portion thereof). No overnight parking of vehicles shall be permitted.**

(g) Tenant shall have the right, non-exclusive and in common with others, to use the common lavatories and other common facilities of the Building.

9. **ENVIRONMENTAL MATTERS.**
(a) Hazardous Substances.
(i) Tenant shall not, except as provided in subparagraph (ii) below, bring or otherwise cause to be brought or permit any of its agents, employees, contractors or invitees to bring in, on or about any part of the Leased Premises, Building or Project, any hazardous substance or hazardous waste in violation of law, as such terms are or may be defined in (x) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., as the same may from time to time be amended, and the regulations promulgated pursuant thereto ("CERCLA"); the United States Department of Transportation Hazardous Materials Table (49 CFR 172.102); by the Environmental Protection Agency as hazardous substances (40 CFR Part 302); the Clean Air Act; and the Clean Water Act, and all amendments, modifications or supplements thereto; (y) the Industrial Site Recovery Act, formerly known as the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq., as the same may from time to time be amended, and the regulations promulgated pursuant thereto ("ISRA"); and/or (z) any other rule, regulation, ordinance, statute or requirements of any governmental or administrative agency regarding the environment [collectively, (x) and (y) shall be referred to as an "Applicable Environmental Law"].

(ii) Tenant may bring to and use at the Leased Premises, hazardous substances incidental to its normal business operations under the NAICS Code referenced in Article 1(n) above solely in de minimis quantities and strictly in accordance with all Applicable Environmental Law. Tenant shall store and handle such substances in strict accordance with all Applicable Environmental Law.

INITIALS:
LANDLORD
TENANT

16

(b)   NAICS Numbers.

(i)   Tenant represents and warrants that the North American Industry Classification System number as designated in the North American Industry Classification System Manual prepared by the Office of Management and Budget, and as set forth in Article 1(n) hereof, is correct. Tenant represents that the specific activities intended to be carried on in the Leased Premises are in accordance with Article 1(j) and Tenant covenants and agrees that it will not do or suffer anything which will cause its NAICS number (or that of any assignee or subtenant) to fall within any of the "major group" classifications of NAICS numbers during the Term hereof (and any exercised renewal term) that will require the submission of an ISRA release prior to vacating the Leased Premises. Tenant further covenants and agrees to notify Landlord at least sixty (60) days prior to any change of facts which would result in the change of Tenant's NAICS number from its present number. Upon such notice, Landlord shall have the right, at its option, to terminate this Lease within thirty (30) days of receipt of such notice by notifying Tenant in writing.

(ii)   Tenant shall not engage in operations at the Leased Premises which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of "hazardous substances" or "hazardous waste" as such terms are defined under any Applicable Environmental Law. Tenant further covenants that it will not cause or permit to exist any "discharge" (as such term is defined under Applicable Environmental Laws) on or about the Leased Premises.

(iii)   (A) If Tenant's operations at the Leased Premises now or hereafter constitute an "Industrial Establishment" subject to the requirements of ISRA, then prior to: (1) closing operations or transferring ownership or operations of Tenant at the Leased Premises (as defined under ISRA), (2) the expiration or sooner termination of this lease, or (3) any assignment of this Lease or any subletting of any portion of the Leased Premises; Tenant shall, at its expense, comply with all requirements of ISRA pertaining thereto. Without limitation of the foregoing, Tenant's obligations shall include (i) the proper filing of an initial notice under N.J.S.A. 13:1K-9(a) to the NJDEP and (ii) the performance of all remediation and other requirements of ISRA, including without limitation all requirements of N.J.S.A. 13:1K-9(b) through and including (l). In the event that Tenant is subject to the requirements of ISRA, then the Tenant shall be responsible to continue the Annual Base Rental payments until the Landlord receives notification of compliance from ISRA.

In addition, upon written request of Landlord, Tenant shall cooperate with Landlord in obtaining Applicable Environmental Laws approval of any transfer of the Building. Specifically in that regard, Tenant agrees that it shall (1) execute and deliver all affidavits, reports, responses to questions, applications or other filings required by Landlord and related to Tenant's activities at the Leased Premises, (2) allow inspections and testing of the Leased Premises during normal business hours, and (3) as respects the Leased Premises, perform any requirement reasonably requested by Landlord necessary for the receipt of approvals under Applicable Environmental Law, provided the foregoing shall be at no out-of-pocket cost or expense to Tenant except for clean-up and remediation costs arising from Tenant's violation of this Article 9.

INITIALS:
LANDLORD 
TENANT

17

(iv)     The parties acknowledge and agree that, except as provided above, pursuant to the provisions of Section 20(c) of ISRA, if ISRA is applicable to Tenant's operations in the Leased Premises, Tenant shall be, and is hereby, designated the party responsible (the "Party Responsible") to comply with the requirements of ISRA (P.L. 1983, c.330) with respect to the Leased Premises, and that as a result, the NJDEP may compel Tenant to so comply. In addition, any failure of Tenant to provide any information and submission as required under Section 20(a) and Section 20(c) of ISRA shall constitute a default under this Lease. Any assignee or subtenant of Tenant shall be deemed to be, and by entering into such assignment or sublease, and/or by entering into possession of the Leased Premises, does hereby, acknowledge that they shall be the Party Responsible, jointly and severally with Tenant, under the provisions of this Lease.

(v)     In the event that Tenant is obligated under this Article or otherwise to perform and/or to comply with Article 9(b)(iii) for any reason, including without limitation inapplicability of ISRA to Tenant, then prior to the expiration or sooner termination of this Lease or any subletting of any portion of the Leased Premises, Tenant shall, at Tenant's expense, and at Landlord's option:

(A)     Obtain from the NJDEP a "non-applicability letter" confirming that the proposed termination, assignment or subletting shall not be subject to the requirements of ISRA. Any representation or certification made by Tenant in connection with the non-applicability letter request shall constitute a representation and warranty by Tenant in favor of Landlord and any misrepresentation or breach of warranty contained in Tenant's request shall constitute a default under this Lease; provided, however, if a non-applicability letter is not issued due to factors relating solely to the Building or parties other than Tenant, then Tenant shall be deemed to have complied with this provision.

(B)     If reasonably indicated by a reputable environmental consultant engaged by Landlord, at Landlord's expense, Tenant shall remove "hazardous waste" or "hazardous waste" attributable to Tenant's occupancy at the Leased Premises in a manner which complies with NJDEP requirements under ISRA, at Tenant's expense, as if ISRA applied to Tenant and/or the Leased Premises.

(vi)     In the event Tenant is obligated, under this Article or otherwise, to perform and/or cooperate in performing any ISRA obligations and/or obtain and/or cooperate in obtaining any ISRA approval, by way of a non-applicability letter, "negative declaration", the performance of an approved remedial action work plan, the obtaining of a no further action letter, the performance under a remediation agreement and/or otherwise (collectively the "ISRA Obligations") and, prior to fully performing such ISRA Obligations, there occurs the scheduled expiration of the Term of this Lease or any other termination of this Lease (collectively, a "Lease Termination"), and in the event (i) Landlord is obligated to deliver possession to a new tenant and (ii) Landlord is prevented from being able to deliver lawful possession because of such failure of Tenant to fully perform same, then Tenant shall, following such Lease Termination, pay, at the time and in the manner Base Rent payments were due during the term, an amount equal to: (i) Base Rent at twice

INITIALS:
LANDLORD 
TENANT

18

the rate in effect immediately prior to such Lease Termination; and (ii) Additional Rent as provided under the Lease until such time as all such ISRA Obligations have been fully completed.

(C)     Additional Terms. In the event of Tenant's failure to comply in full with this Article, Landlord may, after written notice to Tenant and Tenant's failure to cure within thirty (30) days of its receipt of such notice, at Landlord's option, perform any and all of Tenant's obligations as aforesaid and all costs and expenses incurred by Landlord in the exercise of this right shall be deemed to be Additional Rent payable on demand and with interest at the Default Rate. The parties acknowledge and agree that Tenant shall not be held responsible for any environmental issue at the Leased Premises unless such issue was caused by an action or omission of Tenant or its agents, employees, consultants or invitees. Landlord hereby states that to Landlord's actual knowledge, which knowledge is based exclusively on the knowledge of Landlord, Landlord has received no written notice from any applicable Governmental Authority to the effect that there exists at the Leased Premises any Hazardous Substance or Hazardous Waste which exists at the Leased Premises in quantities which requires remediation under Applicable Environmental Laws. This Article 9 shall survive the expiration or sooner termination of this Lease. **LANDLORD REPRESENTS THAT, TO THE BEST OF ITS KNOWLEDGE, THE LEASED PREMISES IS FREE OF CONTAMINATION AS OF THIS DATE AND LANDLORD WILL INDEMNIFY AND SAVE TENANT HARMLESS FROM ANY LIABILITY RESULTING FROM ANY EXISTING CONTAMINATION.**

10.     TENANT'S ALTERATIONS.
Tenant will not cut or drill into or secure any fixture, apparatus or equipment or make alterations, improvements or physical additions (collectively, "Alterations") of any kind to any part of the Leased Premises without first obtaining the written consent of Landlord, such consent not to be unreasonably withheld. Alterations shall, at Landlord's option, be done by Landlord at Tenant's sole cost and expense. Landlord's consent shall not be required for (i) the installation of any office equipment or fixtures including internal partitions which do not require disturbance of any structural elements or systems (other than attachment thereto) within the Building or (ii) minor work, including decorations, carpeting, painting, wallcovering and top window treatments, which does not require disturbance of any structural elements or systems (other than attachment thereto) within the Building. If no approval is required or if Landlord approves Tenant's Alterations and agrees to permit Tenant's contractors to do the work, Tenant, prior to the commencement of labor or supply of any materials, must furnish to Landlord (i) a duplicate or original policy or certificates of insurance evidencing (a) general public liability insurance for personal injury and property damage in the minimum amount of $1,000,000.00 combined single limit, (b) statutory workman's compensation insurance, and (c) employer's liability insurance from each contractor to be employed (all such policies shall be non-cancelable without thirty (30) days prior written notice to Landlord and shall be in amounts and with companies satisfactory to Landlord); (ii) for Alterations requiring Landlord's approval, construction documents prepared and sealed by a registered New Jersey architect; and (iii) all applicable building permits required by law. In connection with all Alterations involving Landlord's approval, Landlord shall be entitled to collect a construction management fee equal to five (5%) percent of the cost of

INITIALS:
LANDLORD 
TENANT

19

the Alteration in connection with Landlord's services in supervising and review of such Alternations. Any approval by Landlord permitting Tenant to do any or cause any work to be done in or about the Leased Premises shall be and hereby is conditioned upon Tenant's work being performed by workmen and mechanics working in harmony and not interfering with labor employed by Landlord, Landlord's mechanics or their contractors or by any other tenant or their contractors. If at any time any of the workmen or mechanics performing any of Tenant's work shall be unable to work in harmony or shall interfere with any labor employed by Landlord, other tenants or their respective mechanics and contractors, then the permission granted by Landlord to Tenant permitting Tenant to do or cause any work to be done in or about the Leased Premises, may be withdrawn by Landlord upon twenty-four (24) hours' notice to Tenant. Any damage done by Tenant's contractors shall be repaired at Tenant's expense. Any construction debris generated by Tenant's alterations must be disposed of at Tenant's expense.

All Alterations (whether temporary or permanent in character) made in or upon the Leased Premises, either by Landlord or Tenant, shall be Landlord's property upon installation and shall remain on the Leased Premises without compensation to Tenant unless, with respect to Alterations for which Landlord's approval is required, Landlord provides written notice to Tenant at the time Landlord approves said Alterations that Tenant shall be required to remove same at the expiration of the Lease, in which event Tenant shall, prior to the expiration of the Term, remove such Alterations and restore the Leased Premises to the condition they were in prior to such Alterations, reasonable wear and tear excepted. All furniture, movable trade fixtures and equipment (including telephone, security and communication equipment system wiring and cabling) installed by Landlord at Tenant's request, Tenant, its assignees and sublessees shall be removed by Tenant at the termination of this Lease. All such installations, removals and restoration shall be accomplished in a good and workmanlike manner so as not to damage the Leased Premises or Building and in such manner so as not to disturb other tenants in the Building. If Tenant fails to remove any items required to be removed pursuant to this Article, Landlord may do so and the reasonable costs and expenses thereof shall be deemed Additional Rent hereunder and shall be reimbursed by Tenant to Landlord within fifteen (15) business days of Tenant's receipt of an invoice therefor from Landlord.

11.   **CONSTRUCTION LIENS.**

Tenant will not suffer or permit any contractor's, subcontractor's or supplier's lien (a "Construction Lien") to be filed against the Leased Premises or any part thereof by reason of work, labor services or materials supplied or claimed to have been supplied to Tenant; and if any Construction Lien shall at any time be filed against the Leased Premises or any part thereof, Tenant, within ten (10) days after notice of the filing thereof, shall cause it to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such Construction Lien to be discharged within the period aforesaid then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings. Any amount so paid by Landlord, plus all of Landlord's costs and expenses associated

INITIALS:
LANDLORD ͭA͝S
TENANT ͤͨ

20

therewith (including, without limitation, reasonable legal fees), shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand with interest from the date of advance by Landlord at the Default Rate.

12.    ASSIGNMENT AND SUBLETTING.

(a)    Subject to the remaining subsections of <u>Article 12</u>, except as expressly permitted pursuant to this section, Tenant shall not, without the prior written consent of Landlord, such consent not to be unreasonably withheld, conditioned or delayed, assign, transfer or hypothecate this Lease or any interest herein or sublet the Leased Premises or any part thereof. Any of the foregoing acts without such consent shall be void and shall, at the option of Landlord, terminate this Lease. Subject to subparagraph 12(i) below, this Lease shall not, nor shall any interest herein, be assignable as to the interest of Tenant by operation of law or by merger, consolidation or asset sale, without the written consent of Landlord.

(b)    If at any time or from time to time during the term of this Lease Tenant desires to assign this Lease or sublet all or any part of the Leased Premises, Tenant shall give notice to Landlord of such desire, including the name, address and contact party for the proposed assignee or subtenant, a description of such party's business history, financial statement, the effective date of the proposed assignment or sublease (including the proposed occupancy date by the proposed assignee or sublessee), and in the instance of a proposed sublease, the square footage to be subleased, a floor plan professionally drawn to scale depicting the proposed sublease area, and a statement of the duration of the proposed sublease (which shall in any and all events expire by its terms at or prior to the scheduled expiration of this Lease, and immediately upon the sooner termination hereof). Landlord may, at its option, and in its sole and absolute discretion, exercisable by notice given to Tenant within forty-five (45) days following Landlord's receipt of Tenant's notice (which notice from Tenant shall, as a condition of its effectiveness, include all of the above-enumerated information), elect to recapture the Leased Premises if Tenant is proposing to sublet or assign the Leased Premises or such portion as is proposed by Tenant to be sublet, and terminate this Lease with respect to the space being recaptured.

(c)    If Landlord elects to recapture the Leased Premises or a portion thereof as aforesaid, then from and after the effective date thereof as approved by Landlord, after Tenant shall have fully performed such obligations as are enumerated herein to be performed by Tenant in connection with such recapture, and except as to obligations and liabilities accrued and unperformed (and any other obligations expressly stated in this Lease to survive the expiration or sooner termination of this Lease), Tenant shall be released of and from all lease obligations thereafter otherwise accruing with respect to the Leased Premises (or such lesser portion as shall have been recaptured by Landlord). The Leased Premises, or such portion thereof as Landlord shall have elected to recapture, shall be delivered by Tenant to Landlord free and clear of all furniture, furnishings, personal property and removable fixtures, with Tenant repairing and restoring any and all damage to the Leased Premises resulting from the installation, handling or removal thereof, and otherwise in the same condition as Tenant is, by the terms of this Lease, required to redeliver the Leased Premises to Landlord upon the expiration or sooner termination of this Lease. In the event of

INITIALS:
LANDLORD 
TENANT

21

a sublease of less than all of the Leased Premises, the cost of erecting any required demising walls, entrances and entrance corridors, and any other or further improvements required in connection therewith, including without limitation, modifications to HVAC, electrical, plumbing, fire, life safety and security systems (if any), painting, wallpapering and other finish items as may be acceptable to or specified by Landlord shall be paid by Tenant. All of the foregoing improvements shall be made in accordance with applicable legal requirements and Landlord's then-standard base building specifications and shall be performed by Landlord's contractors. Upon the completion of any recapture and termination as provided herein, Tenant's Base Rent, Expenses and other monetary obligations hereunder shall be adjusted pro-rated based upon the reduced rentable square footage then comprising the Leased Premises.

(d)     If Landlord elects not to recapture the Leased Premises (or so much thereof as Tenant had proposed to sublease), then Tenant may proceed to market the designated space and may complete such transaction and execute an assignment of this Lease or a sublease agreement (in each case in form acceptable to Landlord) within a period of six (6) months, provided that Tenant shall have first obtained in any such case the prior written consent of Landlord to such transaction, which consent shall not be unreasonably withheld. If, however, Tenant shall not have assigned this Lease or sublet the Leased Premises with Landlord's prior written consent as aforesaid within six (6) months next following Landlord's decision not to recapture the Leased Premises (or such portion thereof as Tenant initially sought to sublease), then in such event, Tenant shall again be required to request Landlord's consent to the proposed transaction, whereupon Landlord's right to recapture the Leased Premises (or such portion as Tenant shall desire to sublease) shall be renewed upon the same terms and as otherwise provided in subsection (b) above.

For purposes of this Article 12(d), and without limiting the basis upon which Landlord may withhold its consent to any proposed assignment or sublease, the parties agree that it shall not be unreasonable for Landlord to withhold its consent to such assignment or sublease if: (i) the proposed assignee or sublessee shall have a net worth which is not acceptable to Landlord in Landlord's reasonable discretion; (ii) the proposed assignee or sublessee shall have no reliable credit history or an unfavorable credit history, or other reasonable evidence exists that the proposed assignee or sublessee will experience difficulty in satisfying its financial or other obligations under this Lease; (iii) the proposed assignee of sublessee, in Landlord's reasonable opinion, is not reputable and of good character; (iv) the portion of the Leased Premises requested to be subleased renders the balance of the Leased Premises unleasable as a separate area; (v) Tenant is proposing a sublease at a rental or subrental rate which is less than the then fair market rental rate for the portion of the Leased Premises being subleased or assigned, or Tenant is proposing to assign or sublease to an existing tenant of the Building (unless Landlord does not then have space available in the Building that will accommodate such tenant's requirements) or to another prospect with whom Landlord is negotiating for the lease of space in the Building; (vi) the proposed assignee or sublessee will cause Landlord's existing parking facilities to be reasonably inadequate, or in violation of code requirements, or require Landlord to increase the parking area or the number of parking spaces to meet code requirements, or the nature of such party's business shall reasonably require more than four (4) parking spaces per 1,000 rentable square feet of floor space, or (vii) the nature of such

INITIALS:
LANDLORD
TENANT

22

party's proposed business operation would or might reasonably permit or require the use of the Leased Premises in a manner inconsistent with the "Permitted Use" specified herein, would or might reasonably otherwise be in conflict with express provisions of this Lease, would or might reasonably violate the terms of any other lease for the Building, or would, in Landlord's reasonable judgment, otherwise be incompatible with other tenancies in the Building.

(e)     Any sums or other economic consideration received by Tenant as a result of any subletting, assignment or license (except rental or other payments received which are attributable to the amortization of the cost of leasehold improvements made to the sublet or assigned portion of the Leased Premises by Tenant for subtenant or assignee, and other reasonable expenses incident to the subletting or assignment, including standard leasing commissions) whether denominated rentals under the sublease or otherwise, which exceed, in the aggregate, the total sums which Tenant is obligated to pay Landlord under this Lease (prorated to reflect obligations allocable to that portion of the Leased Premises subject to such sublease or assignment) shall be paid to Landlord as Additional Rental under this Lease without affecting or reducing any other obligation of Tenant hereunder.

(f)     Regardless of Landlord's consent, no subletting or assignment shall release Tenant of Tenant's obligation or alter the primary liability of Tenant to pay the Rent and to perform all other obligations to be performed by Tenant hereunder. The acceptance of rental by Landlord from any other person shall not be deemed to be a waiver by Landlord of any provision hereof. Consent to one assignment or subletting shall not be deemed consent to any subsequent assignment or subletting. In the event of default by any assignee of Tenant or any successor of Tenant in the performance of any of the terms hereof, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against such assignee or successor.

(g)     In the event that (i) the Leased Premises or any part thereof are sublet and Tenant is in default under this Lease, or (ii) this Lease is assigned by Tenant, then, Landlord may collect Rent from the assignee or subtenant and apply the net amount collected to the rent herein reserved; but no such collection shall be deemed a waiver of the provisions of this Article 12 with respect to assignment and subletting, or the acceptance of such assignee or subtenant as Tenant hereunder, or a release of Tenant from further performance of the covenants herein contained.

(h)     In connection with each proposed assignment or subletting of the Leased Premises by Tenant, Tenant shall pay to Landlord (i) an administrative fee of $200.00 per request (including requests for non-disturbance agreements and Landlord's or its lender's waivers) in order to defer Landlord's administrative expenses arising from such request, plus (ii) Landlord's reasonable attorneys' fees.

(i)     Tenant may, after notice to, but without the consent of Landlord, and without Landlord being entitled to recapture or to receive amounts pursuant to subparagraph (e) above, assign this Lease to an affiliate (i.e., a corporation 51% or more of whose capital stock is owned by the same stockholders owning 51% or more of Tenant's capital stock), parent or subsidiary corporation of Tenant or to an individual, corporation or other entity to which it sells or assigns all of substantially all of its business, assets or stock or with which it may be consolidated or merged ("Affiliate"), provided such purchasing, consolidated, merged, affiliated or subsidiary individual or entity shall, in writing, assume and agree to perform all of the obligations of Tenant under this Lease,

INITIALS:
LANDLORD 
TENANT

23

and it shall deliver such assumption with a copy of such assignment to Landlord within ten (10) days thereafter, and provided further that Tenant shall not be released or discharged from any liability under this Lease by reason of such assignment.

(j)      Anything in this Article 12 to the contrary notwithstanding, except pursuant to subparagraph (i) above, no assignment or sublease shall be permitted under this Lease if Tenant is in default beyond the expiration of any applicable grace, notice or cure period at the time of such assignment.

13.    **LANDLORD'S RIGHT OF ENTRY.**

Landlord and persons authorized by Landlord may enter the Leased Premises at all reasonable times upon reasonable advance notice (except in the case of an emergency in which case no prior notice is necessary) for the purpose of inspections, repairs, alterations to adjoining space, appraisals, or other reasonable purposes; including enforcement of Landlord's rights under this Lease. Landlord shall not be liable for inconvenience to or disturbance of Tenant by reason of any such entry; provided, however, that in the case of repairs or work, such shall be done, so far as practicable, so as to not unreasonably interfere with Tenant's use of the Leased Premises. Provided, however, that such efforts shall not require Landlord to use overtime labor unless Tenant shall pay for the increased costs to be incurred by Landlord for such overtime labor. Landlord also shall have the right to enter the Leased Premises at all reasonable times after giving prior oral notice to Tenant, to exhibit the Leased Premises to any prospective purchaser and/or mortgagee. Landlord also shall have the right to enter the Leased Premises at all reasonable times during the last six (6) months of the Term, after giving prior oral notice to Tenant, to exhibit the Leased Premises to any prospective tenants.

If Landlord is not responsible for janitorial service in Tenant's space, such routine entry is hereby not authorized by Tenant.

14.    **REPAIRS AND MAINTENANCE.**

(a)      Except as specifically otherwise provided in subparagraphs (b) and (c) of this Article, Tenant, at its sole cost and expense and throughout the Term of this Lease, shall keep and maintain the Leased Premises in good order and condition, free of accumulation of dirt and rubbish, and shall promptly make all non-structural repairs necessary to keep and maintain such good order and condition. Tenant shall have the option of replacing lights, ballasts, tubes, ceiling tiles, outlets and similar equipment itself or it shall have the ability to advise Landlord of Tenant's desire to have Landlord make such repairs. If requested by Tenant, Landlord shall make such repairs to the Leased Premises within a reasonable time of notice to Landlord and shall charge Tenant for such services at Landlord's standard rate (such rate to be competitive with the market rate for such services). When used in this Article 14, the term "repairs" shall include replacements and renewals when necessary. All repairs made by Tenant shall utilize materials and equipment, which are at least equal in quality and usefulness to those originally used in constructing the Building and the Leased Premises. Notwithstanding the foregoing, the initial work performed by Landlord to prepare the Leased Premises for Tenant's occupancy shall be warranted by Landlord for a period of one (1) year after the

INITIALS:
LANDLORD 
TENANT

24

Commencement Date, and Landlord shall be responsible for repair of latent defects in the Leased Premises.

(b)     Landlord, throughout the Term of this Lease and at Landlord's sole cost and expenses, shall make all necessary repairs to the footings and foundations and the structural steel columns and girders forming a part of the Leased Premises.

(c)     Landlord shall maintain all of Landlord's HVAC systems, plumbing and electric systems serving the Building and the Leased Premises. Tenant's Allocated Share of Landlord's cost for HVAC, electric and plumbing service, maintenance and repairs, as limited under Article 6 with respect to capital expenditures, shall be included as a portion of Expenses.

(d)     Landlord, throughout the Term of this Lease, shall make all necessary repairs to the Building outside of the Leased Premises and the common areas, and facilities, including the roof, walls, exterior portions of the Leased Premises and the Building, utility lines, equipment and other utility facilities in the Building, which serve more than one tenant of the Building, and to any driveways, sidewalks, curbs, loading, parking and landscaped areas, and other exterior improvements for the Building; and to the common lavatories and other common facilities; provided, however, that Landlord shall have no responsibility to make any repairs unless and until Landlord receives written notice of the need for such repair or Landlord has actual knowledge of the need to make such repair. Tenant shall pay its Allocated Share of the cost of all repairs, as limited under Article 6 with respect to capital repairs to be performed by Landlord as Additional Rent.

(e)     Landlord shall keep and maintain all common areas appurtenant to the Building and any sidewalks, parking areas, curbs and access ways adjoining the Property in a clean and orderly condition, free of accumulation of dirt, rubbish, snow and ice from the drive and parking areas, and shall keep and maintain all landscaped areas in a neat and orderly condition, and shall keep and maintain all common lavatories and other common facilities in a neat, clean, orderly, fully-supplied and good operating condition. Tenant shall pay its Allocated Share of the cost of all work to be performed by Landlord as Additional Rent.

(f)     Notwithstanding anything herein to the contrary, repairs to the Leased Premises, Building or Project and its appurtenant common areas made necessary by a negligent or willful act or omission of Tenant or any employee, agent, contractor, or invitee of Tenant shall be made at the sole cost and expense of Tenant.

(g)     Landlord shall provide janitorial services to the common areas of the Building Monday through Friday of each week and the cost thereof shall be included in Operating Expenses.

15.    **INSURANCE; SUBROGATION RIGHTS.**

(a)     Tenant shall obtain and keep in force at all times during the term hereof, at its own expense, commercial general liability insurance including contractual liability and personal injury liability and all similar coverage, with combined single limits of $2,000,000.00 on account of bodily injury to or death of one or more persons as the result of any one accident or disaster and on account of damage to property, or in such other amounts as Landlord may from time to time require. Tenant shall also require its movers to procure and deliver to Landlord, prior to working within the Building, a certificate of insurance naming Landlord as an additional insured.

INITIALS:
LANDLORD
TENANT

25

(b)      Tenant shall, at its sole cost and expense, maintain in full force and effect on all Tenant's trade fixtures, equipment and personal property on the Leased Premises, a policy of property insurance covering the full replacement value of such property.

(c)      All liability insurance required hereunder shall not be subject to cancellation without at least thirty (30) days' prior notice to all insureds, and shall name Landlord and Tenant as insureds, as their interests may appear. Prior to the commencement of the Term, Tenant shall provide Landlord with certificates which evidence that the coverages required have been obtained for the policy periods. Tenant shall also furnish to Landlord throughout the term hereof replacement certificates at least thirty (30) days prior to the expiration dates of the then current policy or policies. All the insurance required under this Lease shall be issued by insurance companies authorized to do business in the State of New Jersey with a financial rating of at least an A-1 as rated in the most recent edition of Best's Insurance Reports and in business for the past five years. The limit of any such insurance shall not limit the liability of Tenant hereunder. If Tenant fails to procure and maintain such insurance, Landlord may, but shall not be required to, procure and maintain the same, at Tenant's expense to be reimbursed by Tenant as Additional Rent within ten (10) days of written demand. Tenant shall not self-insure without Landlord's prior written consent. Landlord reserves the right to require that Tenant increase the liability coverage limits if, in the reasonable opinion of Landlord, the coverage becomes inadequate or is less than commonly maintained by tenants of similar buildings in the area making similar uses.

(d)      Landlord shall obtain and maintain, in commercially reasonable amounts, fire and extended coverage insurance during the Term of this Lease on the Building, but not Tenant's property, and commercial general liability insurance (including bodily injury and property damage) covering Landlord's operations at the Project.

(e)      Each party hereto, and anyone claiming through or under them by way of subrogation, waives and releases any cause of action it might have against the other party and Landlord and their respective employees, officers, members, partners, trustees and agents, on account of any loss or damage that is insured against under any insurance policy required to be obtained hereunder (to the extent that such loss or damage is recoverable under such insurance policy) that covers the Project, Building or Leased Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements or business and which names Landlord and/or Tenant, as the case may be, as a party insured. Each party hereto agrees that it will cause its insurance carrier to endorse all applicable policies waiving the carrier's right of recovery under subrogation or otherwise against the other party. During any period while such waiver of right of recovery is in effect, each party shall look solely to the proceeds of such policies for compensation for loss, to the extent such proceeds are paid under such policies.

16.  **INDEMNIFICATION.**

Landlord shall defend, indemnify and hold harmless Tenant, and their respective employees and agents from and against any and all third-party claims, actions, damages, liability and expense (including all reasonable attorney's fees, expenses and liabilities incurred in defense of any such

INITIALS:
LANDLORD
TENANT

26

claim or any action or proceeding brought thereon) arising from (i) Landlord's improper operation, management or maintenance of the Building or the Project, (ii) any activity, work or things done by Landlord or its agents, licensees or invitees in or about the Building or the Project or elsewhere contrary to the requirements of the Lease (other than due to Tenant's negligence or willful misconduct), (iii) any breach or default in the performance of any obligation of Landlord's part to be performed under the terms of this Lease, and (iv) any gross negligence or willful act of Landlord or any of Landlord's agents, contractors, employees or invitees. Without limiting the generality of the foregoing, Landlord's obligations shall include any case in which Tenant shall be made a party to any litigation commenced by or against Landlord, its agents, subtenants, licensees, concessionaires, contractors, customers or employees, with respect to the matters for which Landlord is indemnifying Tenant as set forth above, in which case, in connection with such litigation, Landlord shall defend, indemnify and hold harmless Tenant, and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by Tenant, in connection with such litigation, after notice to Landlord and Landlord's refusal to defend such litigation, and upon notice from Tenant shall defend the same at Landlord's expense.

Tenant shall defend, indemnify and hold harmless Landlord, and their respective employees and agents from and against any and all third-party claims, actions, damages, liability and expense (including all reasonable attorney's fees, expenses and liabilities incurred in defense of any such claim or any action or proceeding brought thereon) arising from (i) Tenant's improper operation, management or maintenance of the Leased Premises, (ii) any activity, work or things done, permitted or suffered by Tenant or its agents, licensees or invitees in or about the Building or the Project or elsewhere contrary to the requirements of the Lease (other than due to Landlord's negligence or willful misconduct), (iii) any breach or default in the performance of any obligation of Tenant's part to be performed under the terms of this Lease, and (iv) any gross negligence or willful act of Tenant or any of Tenant's agents, contractors, employees or invitees. Without limiting the generality of the foregoing, Tenant's obligations shall include any case in which Landlord shall be made a party to any litigation commenced by or against Tenant, its agents, subtenants, licensees, concessionaires, contractors, customers or employees, with respect to the matters for which Tenant is indemnifying Landlord as set forth above, in which case, in connection with such litigation, Tenant shall defend, indemnify and hold harmless Landlord, and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by Landlord, in connection with such litigation, after notice to Tenant and Tenant's refusal to defend such litigation, and upon notice from Landlord shall defend the same at Tenant's expense.

17.   **QUIET ENJOYMENT.**
Provided Tenant has performed all of the terms and conditions of this Lease, including the payment of Base Rent and Additional Rent, to be performed by Tenant, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term, without hindrance from Landlord, or anyone claiming by, through or under Landlord under and subject to the terms and conditions of this Lease and of any mortgages now or hereafter affecting all of or any portion of the

INITIALS:
LANDLORD 
TENANT

27

Leased Premises.

18.    **FIRE DAMAGE.**

(a) Except as provided below, in case of damage to the Leased Premises by fire or other insured casualty, Landlord shall repair the damage. Such repair work shall be commenced promptly following notice of the damage and completed with due diligence, taking into account the time required for Landlord to effect a settlement with and procure insurance proceeds from the insurer, except for delays due to governmental regulation, scarcity of or inability to obtain labor or materials, intervening acts of God or other causes beyond Landlord's reasonable control.

(b) Notwithstanding the foregoing, if (i) the damage is of a nature or extent that, in Landlord's reasonable judgment (to be communicated to Tenant within sixty (60) days from the date of the casualty), the repair and restoration work would require more than two hundred ten (210) consecutive days to complete after the casualty (assuming normal work crews not engaged in overtime), or (ii) if more than thirty (30%) percent of the total area of the Building is extensively damaged, or (iii) the casualty occurs in the last Lease Year of the Term and Tenant has not exercised a renewal right, either party shall have the right to terminate this Lease and all the unaccrued obligations of the parties hereto, by sending written notice of such termination to the other within ten (10) days of Tenant's receipt of the notice from Landlord described above. Such notice is to specify a termination date no less than fifteen (15) days after its transmission.

(c) In the event Landlord has not completed restoration of the Leased Premises within two hundred ten (210) days from the date of casualty (subject to delay due to weather conditions, shortages of labor or materials or other reasons beyond Landlord's control), Tenant may terminate this Lease by written notice to Landlord within thirty (30) business days following the expiration of such 210 day period (as extended for reasons beyond Landlord's control as provided above) unless, within thirty (30) business days following receipt of such notice, Landlord has substantially completed such restoration and delivered the Leased Premises to Tenant for occupancy. Notwithstanding the foregoing, in the event Tenant is responsible for the aforesaid casualty, Tenant shall not have the right to terminate this Lease if Landlord is willing to rebuild and restore the Leased Premises.

(d)    In the event of damage or destruction to the Leased Premises or any part thereof, Tenant's obligation to pay Base Rent and Additional Rent shall be equitably adjusted or abated.

19.    **SUBORDINATION; RIGHTS OF MORTGAGEE.**

This Lease shall be subject and subordinate at all times to the lien of any mortgages now or hereafter placed upon the Leased Premises, Building and/or Project and land of which they are a part without the necessity of any further instrument or act on the part of Tenant to effectuate such subordination. Tenant further agrees to execute and deliver upon demand such further instrument or instruments evidencing such subordination of this Lease to the lien of any such mortgage and such further instrument or instruments of attornment as shall be desired by any mortgagee or proposed mortgagee or by any other person. Upon written request of Tenant, Landlord

INITIALS:
LANDLORD TAS
TENANT ET

28

shall use its reasonable efforts to deliver a subordination, attornment and nondisturbance agreement ("Nondisturbance Agreement") from Landlord's Mortgagee, on mortgagee's standard form, which shall provide, inter alia, that the leasehold estate granted to Tenant under this Lease will not be terminated or disturbed by reason of the foreclosure of the mortgage held by Landlord's Mortgagee, so long as Tenant shall not be in default under this Lease and shall pay all sums due under this Lease without offsets or defenses thereto and shall fully perform and comply with all of the terms, covenants and conditions of this Lease on the part of Tenant to be performed and/or complied with, and in the event a mortgagee or its respective successor or assigns shall enter into and lawfully become possessed of the Leased Premises covered by this Lease and shall succeed to the rights of Landlord hereunder, Tenant will attorn to the successor as its landlord under this Lease and, upon the request of such successor landlord, Tenant will execute and deliver an attornment agreement in favor of the successor landlord.

20.   **CONDEMNATION.**
        (a)   If more than twenty (20%) percent of the floor area of the Leased Premises is taken or condemned for a public or quasi-public use (a sale in lieu of condemnation to be deemed a taking or condemnation for purposes of this Lease), this Lease shall, at either party's option, terminate as of the date title to the condemned real estate vests in the condemner, and the Base Rent and Additional Rent herein reserved shall be apportioned and paid in full by Tenant to Landlord to that date and all rent prepaid for any period beyond that date shall forthwith be repaid by Landlord to Tenant and neither party shall thereafter have any liability hereunder.
        (b)   If less than twenty (20%) percent of the floor area of the Leased Premises is taken or if neither Landlord nor Tenant have elected to terminate this Lease pursuant to the preceding sentence, Landlord shall do such work as may be reasonably necessary to restore the portion of the Leased Premises not taken to tenantable condition for Tenant's uses, but shall not be required to expend more than the net award Landlord reasonably expects to be available for restoration of the Leased Premises. If Landlord determines that the damages available for restoration of the Building and/or Project will not be sufficient to pay the cost of restoration, Landlord may terminate this Lease by giving Tenant thirty (30) days prior notice specifying the termination date.
        (c)   If this Lease is not terminated after any such taking or condemnation, the Base Rent and the Additional Rent shall be equitably reduced in proportion to the area of the Leased Premises, which has been taken for the balance of the Term.
        (d)   If a part or all of the Leased Premises shall be taken or condemned, all compensation awarded upon such condemnation or taking shall go to Landlord and Tenant shall have no claim thereto other than Tenant's damages associated with moving, storage and relocation; and Tenant hereby expressly waives, relinquishes and releases to Landlord any claim for damages or other compensation to which Tenant might otherwise be entitled because of any such taking or limitation of the leasehold estate hereby created, and irrevocably assigns and transfers to Landlord any right to compensation of all or a part of the Leased Premises or the leasehold estate.

21.   **ESTOPPEL CERTIFICATE.**

INITIALS:
LANDLORD
TENANT

29

Each party agrees at any time and from time to time, within ten (10) days after the other party's written request, to execute, acknowledge and deliver to the other party a written instrument in recordable form certifying all information reasonably requested including, but not limited to, the following: that this Lease is unmodified and in full force and effect (or if there have been modifications, that it is in full force and effect as modified and stating the modifications), the Commencement Date, the expiration date of this Lease, the square footage of the Leased Premises, the rental rates applicable to the Leased Premises, the dates to which Rent, Additional Rent, and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of the party signing such certificate, the requesting party is in default in the performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge. It is intended that any such certification and statement delivered pursuant to this Article may be relied upon by any prospective purchaser of the Project or any mortgagee thereof or any assignee of Landlord's interest in this Lease or of any mortgage upon the fee of the Leased Premises or any part thereof.

22.   **DEFAULT.**
      If:

(a)      Tenant fails to pay any installment of Base Rent or any amount of Additional Rent when due; provided, however, Landlord shall provide written notice of the failure to pay such Rent and Tenant shall have a three (3) business day grace period from its receipt of such Landlord's notice (facsimile receipt being deemed to be notice hereunder) within which to pay such Rent without creating a default hereunder. The late fee set forth in Article 5 hereof shall be due on the tenth day after such payment is due irrespective of the foregoing notice and grace period. **No additional notice shall be required thereafter and Landlord shall be entitled to immediately exercise its remedies hereunder if payment is not received during the grace period,**

(b)      Tenant "vacates" the Leased Premises (other than in the case of a permitted subletting or assignment) or permits the same to be unoccupied Tenant fails to remove a construction or mechanics lien within the time period set forth in Article 11,

(c)      Tenant fails to observe or perform any of Tenant's other non-monetary agreements or obligations herein contained within thirty (30) days after written notice specifying the default, or the expiration of such additional time period as is reasonably necessary to cure such default, provided Tenant promptly commences and thereafter proceeds with all due diligence and in good faith to cure such default,

(d)      Tenant makes any assignment for the benefit of creditors,

(e)      a petition is filed or any proceeding is commenced against Tenant or by Tenant under any federal or state bankruptcy or insolvency law and such petition or proceeding is not dismissed within thirty (30) days,

(f)      a receiver or other official is appointed for Tenant or for a substantial part of Tenant's assets or for Tenant's interests in this Lease,

(g)      any attachment or execution against a substantial part of Tenant's assets or of Tenant's interests in this Lease remains unstayed or undismissed for a period of more than thirty (30)

INITIALS:
LANDLORD 
TENANT

30

days, or

(h)     a substantial part of Tenant's assets or of Tenant's interest in this Lease is taken by legal process in any action against Tenant, then, in any such event, an Event of Default shall be deemed to exist and Tenant shall be in default hereunder.

then, in any such event, an Event of Default shall be deemed to exist and Tenant shall be in default hereunder.

If an Event of Default shall occur, the following provisions shall apply and Landlord shall have, in addition to all other rights and remedies available at law or in equity, the rights and remedies set forth therein, which rights and remedies may be exercised upon or at any time following the occurrence of an Event of Default unless, prior to such exercise, Landlord shall agree in writing with Tenant that the Event(s) of Default has been cured by Tenant in all respects.

(a)     Acceleration of Rent. By notice to Tenant, Landlord shall have the right to accelerate all Base Rent and all expense installments due hereunder and otherwise payable in installments over the remainder of the Term, and, at Landlord's option, any other Additional Rent to the extent that such Additional Rent can be determined and calculated to a fixed sum; and the amount of accelerated rent to the termination date, without further notice or demand for payment, shall be due and payable by Tenant within five (5) days after Landlord has so notified Tenant, such amount collected from Tenant shall be discounted to present value using an interest rate of six percent (6%) per annum. Additional Rent, which has not been included, in whole or in part, in accelerated rent, shall be due and payable by Tenant during the remainder of the Term, in the amounts and at the times otherwise provided for in this Lease.

Notwithstanding the foregoing or the application of any rule of law based on election of remedies or otherwise, if Tenant fails to pay the accelerated rent in full when due, Landlord thereafter shall have the right by notice to Tenant, (i) to terminate Tenant's further right to possession of the Leased Premises and (ii) to terminate this Lease under subparagraph (b) below; and if Tenant shall have paid part but not all of the accelerated rent, the portion thereof attributable to the period equivalent to the part of the Term remaining after Landlord's termination of possession or termination of this Lease shall be applied by Landlord against Tenant's obligations owing to Landlord, as determined by the applicable provisions of subparagraphs (c) and (d) below.

(b)     Termination of Lease. By at least seven (7) days' prior written notice to Tenant, Landlord shall have the right to terminate this Lease as of a date specified in the notice of termination and in such case, Tenant's rights, including any based on any option to renew, to the possession and use of the Leased Premises shall end absolutely as of the termination date; and this Lease shall also terminate in all respects except for the provisions hereof regarding Landlord's damages and Tenant's liabilities arising prior to, out of and following the Event of Default and the ensuing termination.

Following such termination and the notice of same provided above (as well as upon any other termination of this Lease by expiration of the Term or otherwise) Landlord immediately

INITIALS:
LANDLORD
TENANT

31

shall have the right to recover possession of the Leased Premises; and to that end, Landlord may enter the Leased Premises and take possession, without the necessity of giving Tenant any notice to quit or any other further notice, with or without legal process or proceedings, and in so doing Landlord may remove Tenant's property (including any improvements or additions to the Leased Premises which Tenant made, unless made with Landlord's consent which expressly permitted Tenant to not remove the same upon expiration of the Term), as well as the property of others as may be in the Leased Premises, and make disposition thereof in such manner as Landlord may deem to be commercially reasonable and necessary under the circumstances.

(c)   Tenant's Continuing Obligations/Landlord's Reletting Rights.

(i)   Unless and until Landlord shall have terminated this Lease under subparagraph (b) above, Tenant shall remain fully liable and responsible to perform all of the covenants and to observe all the conditions of this Lease throughout the remainder of the Term to the early termination date; and, in addition, Tenant shall pay to Landlord, upon demand and as Additional Rent, the total sum of all costs, losses, damages and expenses, including reasonable attorneys' fees, as Landlord incurs, directly or indirectly, because of any Event of Default having occurred.

(ii)   If Landlord either terminates Tenant's right to possession without terminating this Lease or terminates this Lease and Tenant's leasehold estate as above provided, then, subject to the provisions below, Landlord shall have the unrestricted right to relet the Leased Premises or any part(s) thereof to such tenant(s) on such provisions and for such period(s) as Landlord may deem appropriate. If Landlord relets the Leased Premises after such a default, the costs recovered from Tenant shall be reallocated to take into consideration any additional rent, which Landlord receives, from the new tenant, which is in excess to that which was owed by Tenant, Landlord shall use commercially reasonable efforts to relet the Leased Premises.

(d)   Landlord's Damages.

(i)   The damages which Landlord shall be entitled to recover from Tenant shall be the sum of:

(A)   all Base Rent and Additional Rent accrued and unpaid as of the termination date; and

(B)   (i) all costs and expenses incurred by Landlord in recovering possession of the Leased Premises, including removal and storage of Tenant's property, (ii) the costs and expenses of restoring the Leased Premises to the condition in which the same were to have been surrendered by Tenant as of the expiration of the Term, and (iii) the costs of reletting commissions; and

(C)   all Base Rent and Additional Rent (to the extent that the amount(s) of Additional Rent has been then determined) otherwise payable by Tenant over the remainder of the Term as reduced to present value.  Less deducting from the total determined under subparagraphs (A), (B) and (C) all Rent and all other Additional Rent to the extent determinable as aforesaid, (to the extent that like charges would have been payable by Tenant) which Landlord receives from other tenant(s) by reason of the leasing of the Leased Premises or part during or attributable to any period falling within the otherwise remainder of the Term.

INITIALS:
LANDLORD꜒TAS
TENANT ꜒ꞇ

(ii)     The damage sums payable by Tenant under the preceding provisions of this subparagraph (d) shall be payable on demand from time to time as the amounts are determined; and if from Landlord's subsequent receipt of rent as aforesaid from reletting, there be any excess payment(s) by Tenant by reason of the crediting of such rent thereafter received, the excess payment(s) shall be refunded by Landlord to Tenant, without interest.

(iii)     Landlord may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, and for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief, and for recovery of consequential damages and all moneys due or to become due from Tenant under any of the provisions of this Lease.

(e)     Landlord's Right to Cure.  Without limiting the generality of the foregoing, if Tenant shall be in default in the performance of any of its obligations hereunder beyond the expiration of any applicable grace, notice or cure period, Landlord, without being required to give Tenant any notice or opportunity to cure, may (but shall not be obligated to do so), in addition to any other rights it may have in law or in equity, cure such default on behalf of Tenant, and Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord in curing such default, collection of rent or Operating Expenses, including reasonable attorneys' fees and other legal expenses, together with interest at a 10% per annum Rate from the dates of Landlord's incurring of costs or expenses.

(f)     Interest on Damage Amounts.  Any sums payable by Tenant hereunder, which are not paid after the same shall be due, shall bear interest from that day until paid at the rate of six (6%) percent over the then Prime Rate as published daily under the heading "Money Rates" in The Wall Street Journal, unless such rate be usurious as applied to Tenant, in which case the highest permitted legal rate shall apply (the "Default Rate").

(g)     Landlord's Statutory Rights.  Landlord shall have all rights and remedies now or hereafter existing at law or in equity with respect to the enforcement of Tenant's obligations hereunder and the recovery of the Leased Premises.  No right or remedy herein conferred upon or reserved to Landlord shall be exclusive of any other right or remedy, but shall be cumulative and in addition to all other rights and remedies given hereunder or now or hereafter existing at law. Landlord shall be entitled to injunctive relief in case of the violation, or attempted or threatened violation, of any covenant, agreement, condition or provision of this Lease, or to a decree compelling performance of any covenant, agreement, condition or provision of this Lease.

(h)     Remedies Not Limited.  Nothing herein contained shall limit or prejudice the right of Landlord to exercise any or all rights and remedies available to Landlord by reason of default or to prove for and obtain in proceedings under any bankruptcy or insolvency laws, an amount equal to the maximum allowed by any law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damage referred to above.

(i)     No Waiver by Landlord.  No delay or forbearance by Landlord in exercising any right or remedy hereunder, or Landlord's undertaking or performing any act or matter which is not expressly required to be undertaken by Landlord shall be construed, respectively, to be a waiver

INITIALS:
LANDLORD 
TENANT

33

of Landlord's rights or to represent any agreement by Landlord to undertake or perform such act or matter thereafter. Waiver by Landlord of any breach by Tenant of any covenant or condition herein contained (which waiver shall be effective only if so expressed in writing by Landlord) or failure by Landlord to exercise any right or remedy in respect of any such breach shall not constitute a waiver or relinquishment for the future of Landlord's right to have any such covenant or condition duly performed or observed by Tenant, or of Landlord's rights arising because of any subsequent breach of any such covenant or condition nor bar any right or remedy of Landlord in respect of such breach or any subsequent breach. Landlord's receipt and acceptance of any payment from Tenant which is tendered not in conformity with the provisions of this Lease or following an Event of Default (regardless of any endorsement or notation on any check or any statement in any letter accompanying any payment) shall not operate as an accord and satisfaction or a waiver of the right of Landlord to recover any payments then owing by Tenant which are not paid in full, or act as a bar to the termination of this Lease and the recovery of the Leased Premises because of Tenant's previous default.

(j)   Reimbursement upon Demand.   Tenant shall reimburse Landlord upon demand for payment to the extent the amount due is not in dispute.

### 23.   LANDLORD'S REPRESENTATIONS AND WARRANTIES.

Landlord represents and warrants to Tenant that: (a) Landlord is the owner of the Building and the Project; (b) Landlord has the authority to enter into this Lease and (c) the person executing this Lease is duly authorized to execute and deliver this Lease on behalf of Landlord.

### 24.   SURRENDER.

Tenant shall, at the expiration of the Term, promptly quit and surrender the Leased Premises in good order and condition and in conformity with the applicable provisions of this Lease, excepting only reasonable wear and tear and damage by fire or other insured casualty. Tenant shall have no right to hold over beyond the expiration of the Term and in the event Tenant shall fail to deliver possession of the Leased Premises as herein provided, such occupancy shall not be construed to effect or constitute other than a tenancy at sufferance. During any period of beyond the expiration of the Term the amount of rent owed to Landlord by Tenant shall automatically become two hundred (200%) percent the sum of the Rent as those sums are at that time calculated under the provisions of the Lease after notice. The acceptance of rent by Landlord or the failure or delay of Landlord in notifying or evicting Tenant following the expiration or sooner termination of the Term shall not create any tenancy rights in Tenant and any such payments by Tenant may be applied by Landlord against its costs and expenses, including attorney's fees, incurred by Landlord as a result of such holdover.

### 25.   RULES AND REGULATIONS.

Tenant agrees that at all times during the Terms of this Lease (as same may be extended) it, its employees, agents, invitees and licenses shall comply with all rules and regulations specified on Exhibit "C" attached hereto and made a part hereof, together with all reasonable Rules

INITIALS:
LANDLORD 
TENANT

34

and Regulations as Landlord may from time to time promulgate provided they do not increase the financial burdens of Tenant or unreasonably restrict Tenant's rights under this Lease. Tenant's right to dispute the reasonableness of any changes in or additions to the Rules and Regulations shall be deemed waived unless asserted to Landlord within ten (10) business days after Landlord shall have given Tenant written notice of any such adoption or change. In case of any conflict or inconsistency between the provisions of this Lease and any Rules and Regulations, the provisions of this Lease shall control. Landlord shall have no duty or obligation to enforce any Rule and Regulation, or any term, covenant or condition of any other lease, against any other tenant, and Landlord's failure or refusal to enforce any Rule or Regulation or any term, covenant or condition of any other lease against any other tenant shall be without liability of Landlord to Tenant. However, if Landlord does enforce Rules or Regulations, Landlord shall endeavor to enforce same equally in a non-discriminatory manner.

26.   **GOVERNMENTAL REGULATIONS.**

(a) Tenant shall, in the use and occupancy of the Leased Premises and the conduct of Tenant's business or profession therein, at all times comply with all applicable laws, ordinances, orders, notices, rules and regulations of the federal, state and municipal governments, or any of their departments and the regulations of the insurers of the Leased Premises, Building and/or Project.

(b) Without limiting the generality of the foregoing, Tenant shall (i) obtain, at Tenant's expense, before engaging in Tenant's business or profession within the Leased Premises, all necessary licenses and permits including (but not limited to) state and local business licenses or permits, and (ii) remain in compliance with and keep in full force and effect at all times all licenses, consents and permits necessary for the lawful conduct of Tenant's business or profession at the Leased Premises. Tenant shall pay all personal property taxes, income taxes and other taxes, assessments, duties, impositions and similar charges, which are or may be assessed, levied or imposed upon Tenant and which, if not paid, could be liened against the Leased Premises or against Tenant's property therein or against Tenant's leasehold estate.

27.   **NOTICES.**

Wherever in this Lease it shall be required or permitted that notice or demand be given or served by either party to this Lease to or on the other party, such notice or demand shall be deemed to have been duly given or served if in writing and either: (i) personally served; (ii) delivered by pre-paid nationally recognized overnight courier service (e.g. Federal Express) with evidence of receipt required for delivery; (iii) forwarded by Registered or Certified mail, return receipt requested, postage prepaid; (iv) facsimile with a copy mailed by first class United States mail or (v) e-mailed with evidence of receipt and delivery of a copy of the notice by first class mail; in all such cases addressed to the parties at the addresses set forth in Article 1(m) hereof. Each such notice shall be deemed to have been given to or served upon the party to which addressed on the date the same is delivered or delivery is refused. Either party hereto may change its address to which said notice shall be delivered or mailed by giving written notice of such change to the other party hereto, as herein provided.

INITIALS:
LANDLORD 
TENANT

35

28.   **BROKERS.**

Landlord and Tenant each represents and warrants to the other that such party has had no dealings, negotiations or consultations with respect to the Leased Premises or this transaction with any broker or finder other than the Broker identified in Article 1(l); and that otherwise no broker or finder called the Leased Premises to Tenant's attention for lease or took any part in any dealings, negotiations or consultations with respect to the Leased Premises or this Lease. Each party agrees to indemnify and hold the other harmless from and against all liability, cost and expense, including attorney's fees and court costs, arising out of any misrepresentation or breach of warranty under this Article. Landlord shall pay any commission owing to Broker in connection with this Lease.

29.   **LANDLORD'S LIABILITY.**

Landlord's obligations hereunder shall be binding upon Landlord only for the period of time that Landlord is in ownership of the Building; and, upon termination of that ownership, Tenant, except as to any obligations which are then due and owing, shall look solely to Landlord's successor in interest in the Building for the satisfaction of each and every obligation of Landlord hereunder. Landlord shall have no personal liability under any of the terms, conditions or covenants of this Lease and Tenant shall look solely to the equity of Landlord in the Building of which the Leased Premises form a part for the satisfaction of any claim, remedy or cause of action accruing to Tenant as a result of the breach of any Article of this Lease by Landlord. In addition to the foregoing, no recourse shall be had for an obligation of Landlord hereunder, or for any claim based thereon or otherwise in respect thereof, against any past, present or future trustee, member, partner, shareholder, officer, director, partner, agent or employee of Landlord, whether by virtue of any statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, all such other liability being expressly waived and released by Tenant with respect to the above-named individuals and entities.

30.   **AUTHORITY.**

Tenant represents and warrants that (a) Tenant is duly organized, validly existing and legally authorized to do business in the State of New Jersey, (b) the persons executing this Lease are duly authorized to execute and deliver this Lease on behalf of Tenant, and (c) this Lease has been executed under seal in accordance with N.J.S.A. 2A:14-4.

31.   **NO OFFER.**

The submission of the Lease by Landlord to Tenant for examination does not constitute a reservation of or option for the Leased Premises or of any other space within the Building. This Lease shall become effective as a Lease only upon the execution and legal delivery thereof by both parties hereto.

32.   **RELOCATION.**

Landlord, at its sole expense, on at least sixty (60) days' prior written notice to Tenant, may require Tenant to move from the Leased Premises to another suite of substantially

INITIALS:
LANDLORD
TENANT *EC*

comparable size and decor in the Building in order to permit Landlord to consolidate the Leased Premises with other adjoining space leased or to be leased to another tenant in the Building. In the event of any such relocation, Landlord shall pay all the expenses of preparing and decorating the new premises so that they will be substantially similar to the Leased Premises and shall also pay the expenses of moving Tenant's furniture and equipment to the new premises. Tenant shall execute any reasonable amendment evidencing the terms of the relocation as Landlord may require in its reasonable discretion.

33.    **TENANT FINANCIAL INFORMATION.**

Any time and from time to time during the Term (but not more than once during any twelve (12) month period unless a default has occurred under this Lease or Landlord has a reasonable basis to suspect that Tenant has suffered a material adverse change in its financial position) upon not less than thirty (30) days' prior written request from Landlord, Tenant shall deliver to Landlord: (i) a current, accurate, complete and detailed balance sheet of Tenant [dated no more than thirty (30) days prior to such delivery], a profit and loss statement, a cash flow summary and all relevant accounting footnotes, all prepared in accordance with generally accepted accounting principles consistently applied and certified by the Chief Financial Officer of Tenant to be a fair and true presentation of Tenant's current financial position; (ii) a current, accurate, complete and detailed financial statements of Tenant audited by an independent certified public accountant for the last applicable calendar year; and (iii) current bank references for Tenant.

34.    **MISCELLANEOUS PROVISIONS.**

(a)    Successors.  The respective rights and obligations provided in this Lease shall bind and inure to the benefit of the parties hereto, their successors and assigns; provided, however, that no rights shall inure to the benefit of any successors or assigns of Tenant unless Landlord's written consent for the transfer to such successor and/or assignee has first been obtained.

(b)    Governing Law.  This Lease shall be construed, governed and enforced in accordance with the laws of the State of New Jersey, without regard to principles relating to conflicts of law.

(c)    Severability.  If any provisions of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions hereof shall in no way be affected or impaired and such remaining provisions shall remain in full force and effect.

(d)    Captions.  Marginal captions, titles or exhibits and riders and the table of contents in this Lease are for convenience and reference only, and are in no way to be construed as defining, limiting or modifying the scope or intent of the various provisions of this Lease.

(e)    Gender.  As used in this Lease, the word "person" shall mean and include, where appropriate, an individual, corporation, partnership or other entity; the plural shall be substituted for the singular, and the singular for the plural, where appropriate; and the words of any gender shall mean to include any other gender.

(f)    Entire Agreement.  This Lease, including the Exhibits and any Riders hereto (which are hereby incorporated by this reference, except that in the event of any conflict between the

INITIALS:
LANDLORD 
TENANT

37

printed portions of this Lease and any Exhibits or Riders, the term of such Exhibits or Riders shall control), supersedes any prior discussions, proposals, negotiations and discussions between the parties and the Lease contains all the agreements, conditions, understandings, representations and warranties made between the parties hereto with respect to the subject matter hereof, and may not be modified orally or in any manner other than by an agreement in writing signed by both parties hereto or their respective successors in interest. Without in any way limiting the generality of the foregoing, this Lease can only be extended pursuant to the terms hereof, and in Tenant's case, with the terms hereof, with the due exercise of an option (if any) contained herein pursuant to a written agreement signed by both Landlord and Tenant specifically extending the term.

(g)     Counterparts. This Lease may be executed in any number of counterparts, each of which when taken together shall be deemed to be one and the same instrument.

(h)     Facsimile Signatures.     The parties acknowledge and agree that notwithstanding any law or presumption to the contrary a facsimile signature of either party whether upon this Lease or any related document shall be deemed valid and binding and admissible by either party against the other as if same were an original ink signature.

(i)     Time of the Essence. TIME IS OF THE ESSENCE IN ALL PROVISIONS OF THIS LEASE, INCLUDING ALL NOTICE PROVISIONS TO BE PERFORMED BY OR ON BEHALF OF TENANT.

(j)     Recordation of Lease. Tenant shall not record this Lease.

(k)     Accord and Satisfaction. No payment by Tenant or receipt by Landlord of a lesser amount than any payment of Base Rent or Additional Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Base Rent or Additional Rent due and payable hereunder, nor shall any endorsement or statement or any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other right or remedy provided for in this Lease, at law or in equity.

(l)     No Partnership. Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venturer or a member of a joint enterprise with Tenant. This Lease establishes a relationship solely of that of a landlord and tenant.

(m)     Guaranty. In order to induce Landlord to execute this Lease, Tenant agrees that Landlord may, at its option, at the time of the execution of this Lease, require a guaranty of the obligations of the Tenant hereunder by a person, firm, corporation, or other entity other than Tenant but with a business interest in Tenant, acceptable to Landlord, which guaranty shall be in a form attached hereto as Exhibit "D".

(n)     No Presumption Against Drafter. Landlord and Tenant understand, agree, and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in the event of any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease, or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

INITIALS:
LANDLORD 
TENANT _EC_

38

(o)  <u>Force Majeure</u>.        If by reason of strikes or other labor disputes, fire or other casualty (or reasonable delays in adjustment of insurance), accidents, orders or regulations of any Federal, State, County or Municipal authority, or any other cause beyond Landlord's reasonable control, Landlord is unable to furnish or is delayed in furnishing any utility or service required to be furnished by Landlord under the provisions of this Lease or is unable to perform or make or is delayed in performing or making any installations, decorations, repairs, alterations, additions or improvements, or is unable to fulfill or is delayed in fulfilling any of Landlord's other obligations under this Lease, no such inability or delay shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Base Rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

35.    <u>CONSENT TO JURISDICTION & WAIVER OF TRIAL BY JURY</u>.
        Landlord and Tenant waive the right to a trial by jury in any action or proceeding based upon, or related to, the subject matter of this Lease. Tenant further acknowledges that it has read and understands the meaning and ramifications of this waiver provision and, as evidence of same, has executed this Lease after discussion with counsel. Tenant hereby consents to the exclusive jurisdiction of the state courts serving the county where the Leased Premises are located and the applicable district federal courts.

INITIALS:
LANDLORD 
TENANT

IN WITNESS WHEREOF, the parties hereto have executed this Lease, under Seal, the day and year first above written.

LANDLORD:
MONARCH HOLDINGS, L.L.C.

ATTEST: _____

BY: _____

TIMOTHY A. STEVENS
VICE GENERAL MANAGER

W. JEFFREY STEVENS
VICE GENERAL MANAGER

TENANT:
RELIANCE FUNDING SERVICES, INC.

ATTEST: _____

BY: _____

_____
(PRINTED NAME & TITLE)

ERIC COHEN, PRESIDENT/
MANAGER

TENANT:
RELIANCE FUNDING SERVICES, INC.

ATTEST: _____

BY: _____

_____
(PRINTED NAME & TITLE)

STEVE PALO, OWNER

K - ALLINFO - FAM - MONARCH - 1000 CRAWFORD PLACE - LEASES
SUITE 360 - RELIANCE FUNDING SERVICES - 2006-06-09 2281 SQ FT LEASE

INITIALS:
LANDLORD _____
TENANT _____

40

## EXHIBIT "A" - SPACE PLAN - SUITE 360

Attached to and made a part of the Lease Agreement between
MONARCH HOLDINGS, L.L.C., and RELIANCE FUNDING SERVICES, INC.



INITIALS:
LANDLORD
TENANT

EXHIBIT "A-1" - DETAIL OF LANDLORD'S WORK - SUITE 360
See Space Plan attached (Exhibit "A").
**Attached to and made a part of the Lease Agreement between**
**MONARCH HOLDINGS, L.L.C., and RELIANCE FUNDING SERVICES, INC.**
**The following items are to be completed by the Landlord:**

**Suite 360 - 2,281 Rentable Sq. Ft.**

Install 6-foot counter with sink and base cabinets.
Close archway in Break Room.
Install standard building carpet and carpet cove throughout (blue).

INITIALS:
LANDLORD 
TENANT _EC_

42

## EXHIBIT "B" - SAMPLE (FIRST) LEASE MODIFICATION AGREEMENT
### Attached to and made a part of the Lease Agreement between
### MONARCH HOLDINGS, L.L.C., and RELIANCE FUNDING SERVICES, INC.

THIS MODIFICATION is made as of the ___ day of _____, 2006, by Monarch Holdings, L.L.C., a Limited Liability Company of the State of New Jersey, with an address of 365-B New Albany Road, Moorestown, New Jersey, 08057-1117 ("Landlord"), and Reliance Funding Services, Inc., a New Jersey corporation, with Corporate Headquarters ~~currently~~ at 1101 North Kings Highway, Suite G100, Cherry Hill ~~with an additional office location at~~ New Jersey, 08034; ~~but which will change~~ upon Tenant's occupancy of the Leased Premises ~~at~~ 1000 Crawford Place, Suite 360, Mt. Laurel, New Jersey, 08054 ("Tenant"), which entered into a Lease dated for ᐁ阝ꟲ reference purposes as of June ___, 2006, covering certain Leased Premises located at 1000 Crawford Place, Mt. Laurel, New Jersey, 08054.

1. The Parties to this Modification hereby agree that the date of July 1, 2006 is the "Commencement Date" of the Term, that the date of July 1, 2006 is the "Rent Commencement Date", and the date of June 30, 2011 is the "Expiration Date" of the Lease.

2. Tenant hereby confirms the following:

   (a) That it has accepted possession of the Leased Premises pursuant to the terms of the Lease;

   (b) That the improvements, including the Landlord Work, required to be furnished according to the Lease by Landlord have been Substantially Completed;

   (c) That Landlord has fulfilled all of its duties as set forth in the Lease;

   (d) That there are no offsets or credits against rentals, and the $8,592.00 Security Deposit has been paid as provided in the Lease;

   (e) That there is no default by Landlord or Tenant under the Lease and the Lease is in full force and effect.

3. Landlord hereby confirms to Tenant that its Suite Number is 360 in the Leased Premises at 1000 Crawford Place in Mt. Laurel, New Jersey.

Except as modified herein, the parties hereto do hereby ratify and confirm all of the terms, conditions and provisions of the aforesaid Lease as fully and completed as if set forth herein.

INITIALS:
LANDLORD 𝒯𝒟𝒮
TENANT 𝓔𝓒

43

### EXHIBIT "C"
### BUILDING RULES AND REGULATIONS
### LAST REVISION: JANUARY 6TH 2005

**Attached to and made a part of the Lease Agreement between**
**MONARCH HOLDINGS, L.L.C., and RELIANCE FUNDING SERVICES, INC.**

Landlord reserves the right to rescind any of these rules and make such other and further rules and regulations as in the judgment of Landlord shall from time to time be needed for the safety, protection, care and cleanliness of the Project, the operations thereof, the preservation of good order therein and the protection and comfort of its tenants, their agents, employees and invitees, which rules when made and notice thereof given to Tenant shall be binding upon Tenant in a like manner as if originally prescribed. Landlord will notify Tenant in writing of any changes to the Building Rules and Regulations.

1.      Sidewalks, entrances, passages, elevators, vestibules, stairways, corridors, halls, lobby and any other part of the Building shall not be obstructed or encumbered by any Tenant or used for any purpose other than ingress or egress to and from each tenant's Leased Premises. Landlord shall have the right to control and operate the common portions of the Building and exterior facilities furnished for common use of the tenants (such as the eating, smoking, and parking areas) in such a manner as Landlord deems appropriate.

2.      No awnings or other projections shall be attached to the outside walls of the Building. All drapes or window blinds must be of a quality type, design and color, and attached in a manner approved by Landlord.

3.      No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, or placed in hallways or vestibules without prior written consent of Landlord.

4.      Rest rooms and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed and no debris, rubbish, rags or other substances shall be thrown therein. Only standard toilet tissue may be flushed in commodes. All damage resulting from any misuse of these fixtures shall be the responsibility of the Tenant who, or whose employees, agents, visitors, clients, or licensees shall have caused same.

5.      No tenant, without the prior consent of Landlord, shall mark, paint, drill into, bore, cut or string wires or in any way deface any part of the Leased Premises or the Building of which they form a part except for the reasonable hanging of decorative or instructional materials on the walls of the Leased Premises.

6.      Tenants shall not construct or maintain, use or operate in any part of the project any electrical device, wiring or other apparatus in connection with a loudspeaker system or other sound/communication system, which may be heard outside the Leased Premises. Any such communication system to be installed within the Leased Premises shall require prior written approval of Landlord.

INITIALS:
LANDLORD
TENANT

44

7.  No mopeds, skateboards, scooters or other vehicles and no animals, birds or other pets of any kind shall be brought into or kept in or about the Building.

8.  No Tenant shall cause or permit any unusual or objectionable odors to be produced upon or permeate from its Leased Premises.

9.  No space in the Building shall be used for the manufacture of goods for sale in the ordinary course of business, or for sale at auction of merchandise, goods or property of any kind.

10. No Tenant, or employees of Tenant, shall make any unseemly or disturbing noises or disturb or interfere with the occupants of this or neighboring buildings or residences by voice, musical instrument, radio, talking machines, whistling, singing, or in any way. All passage through the Building's hallways, elevators, and main lobby shall be conducted in a quiet, businesslike manner. Rollerblading shall not be permitted in the Building nor in the common areas of the Project.

11. No tenant shall throw anything out of the doors, windows, or down corridors or stairs of the Building.

12. Tenant shall not place, install or operate on the Leased Premises or in any part of the Project, any engine, stove or machinery or conduct mechanical operations or cook thereon or therein (except for coffee machine, microwave oven, and/or vending machine), or place or use in or about the Leased Premises or Project any explosives, gasoline, kerosene oil, acids, caustics or any other flammable, explosive or hazardous material without prior written consent of Landlord.

13. No smoking is permitted in the Building or in the rest rooms, hallways, elevators, stairs, lobby, exit and entrance vestibules, sidewalks, and parking lot area except for the designated exterior smoking area. All cigarette ashes and butts are to be deposited in the containers provided for same, and not disposed of on sidewalks, parking lot areas, or toilets within the Building rest rooms.

14. Tenants are not to install any additional locks or bolts of any kind upon any door or window of the Building without prior written consent of Landlord. Each Tenant must, upon the termination of tenancy, return to the Landlord all keys for the Leased Premises, either furnished to or otherwise procured by such tenant, and all Building Access Security Cards to the Building.

15. All doors to hallways and corridors shall be kept closed during business hours except as they may be used for ingress or egress.

16. Tenant shall not use the name of the Building, Landlord or Landlord's Agent in any way in connection with his business except as the address thereof. Landlord shall also have the right to prohibit any advertising by Tenant which, in its sole opinion, tends to impair the reputation of the Building or its desirability as a building for offices and, upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

17. Tenant must be responsible for all Building Access Security Cards issued to it, as well as to secure the return of same from any employee terminating employment with Tenant. Landlord shall allow for up to 1 Building Access Security Card per 300 rentable square feet at no charge to Tenant at Lease inception. All additional cards will be distributed to Tenant

INITIALS:
LANDLORD: TAG
TENANT ZE

45

at a charge of $15.00 per card. Lost cards shall cost $35.00 per card to replace at Tenant's expense. No person/company other than Building Tenant and/or its employees may have Building Access Security Cards unless Landlord grants prior written approval.

18. All deliveries by vendors, couriers, clients, employees or visitors to the Building, which involve the use of a handcart, handtruck, or other heavy equipment or device must be made via the Freight Elevator. Tenant shall be responsible to Landlord for any loss or damage resulting from any deliveries made by or for Tenant to the Building. Tenant shall procure and deliver a certificate of insurance from Tenant's movers, which certificate shall name Landlord as an additional insured.

19. Landlord reserves the right to inspect all freight to be brought into the Building, and to exclude from the Building all freight or other material which violates any of these rules and regulations.

20. Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service on or to the Leased Premises for Tenant, to Landlord for Landlord's approval and supervision before performance of any contractual service or access to Building. This provision shall apply to all work performed in the Building, including installation of telephones, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Building. Landlord reserves the right to require that all agents of contractors/vendors sign in and out of the Building.

21. Landlord reserves the right to exclude from the Building at all times any person who is not known or does not properly identify himself to Landlord's management or security personnel.

22. Landlord may require, at its sole option, all persons entering the Building after 6:00 P.M. or before 7:00 A.M., Monday through Friday, and at any time on Holidays, Saturdays and Sundays, to register at the time they enter and at the time they leave the Building.

23. No space within the Building, or in the common areas, such as the parking lot, may be used at any time for the purpose of lodging, sleeping, or for any immoral or illegal purposes.

24. No employees or invitees of Tenant shall use the hallways, stairs, lobby, or other common areas of the Building as lounging areas during "breaks" or during lunch periods.

25. No canvassing, soliciting or peddling is permitted in the Building or its common areas by Tenants, their employees, or other persons.

26. No mats, trash, or other objects shall be placed in the public corridors, hallways, stairs or other common areas of the Building.

27. Tenant must place all recyclable items of cans, bottles, plastic and office recyclable paper in appropriate containers provided by Landlord.

28. Landlord does not maintain suite finishes which are non-standard, such as kitchens, rest rooms, wallpaper, special lights, etc. However, should the need arise for repair of items not maintained by Landlord, Landlord, at its sole option, may arrange for the work to be done at Tenant's expense.

29. Drapes installed by Tenant, which are visible from the exterior of the Building, must be cleaned by Tenant, at its own expense, at least once a year.

INITIALS:
LANDLORD
TENANT

46

30. No pictures, signage, advertising, decals, banners, etc. are permitted to be placed in or on windows in such a manner as they are visible from the exterior, without the prior written consent of Landlord.

31. Tenant or Tenant's employees are prohibited at any time from eating or drinking in hallways, elevators, rest rooms, lobby or lobby vestibules.

32. Tenant shall be responsible to Landlord for any acts of vandalism performed in the Building by its employees, agents, invitees or visitors.

33. No Tenant shall permit visit to its Leased Premises of persons in such numbers or under such conditions as to interfere with the use and enjoyment of the entrances, hallways, elevators, lobby or other public portions or facilities of the Building and exterior common areas by other tenants.

34. Landlord's employees shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord. Requests for such requirements must be submitted in writing to Landlord.

35. Tenant agrees that neither Tenant nor its agents, employees, licensees or invitees will interfere in any manner with the installation and/or maintenance of the heating, air conditioning and ventilation facilities and equipment.

36. Landlord will not be responsible for lost or stolen personal property, equipment, money or jewelry from Tenant's area or common areas of the Project regardless of whether such loss occurs when area is locked against entry or not.

37. Landlord will not permit entrance to Tenant's Leased Premises by use of a passkey controlled by Landlord to any person at any time without written permission of Tenant, except employees, contractors or service personnel supervised or employed by Landlord.

38. Tenant and its agents, employees and invitees shall observe and comply with the driving and parking signs and markers on the Building grounds and surrounding areas.

39. Tenant and its employees, invitees, agents, etc. shall not enter other separate tenants' hallways, rest rooms or Leased Premises unless they have received prior approval from Landlord's management.

40. Tenant shall not use or permit the use of any portion of the Leased Premises for outdoor storage.

INITIALS:
LANDLORD
TENANT

47

## EXHIBIT "D"
## GUARANTY

### Attached to and made a part of the Lease Agreement between
### MONARCH HOLDINGS, L.L.C., and RELIANCE FUNDING SERVICES, INC.

IN CONSIDERATION of the letting of the Leased Premises described in this Lease and the sum of One Dollar ($1.00) to it in hand paid, the undersigned does hereby become surety for the punctual payment of the rent and performance of the covenants mentioned in said Lease to be performed by **RELIANCE FUNDING SERVICES, INC.** (Federal I. D. # _____ ) and, if any default shall be made therein, the undersigned does hereby promise and agree to pay forthwith unto said **MONARCH HOLDINGS, L.L.C.,** such sum or sums of money as will be sufficient to make such deficiencies and fully satisfy the conditions of such Lease without requiring any notice of nonpayment or proof of demand being made.  This Guaranty will extend to include any amendments, extensions or modifications of the attached Lease.

GIVEN under my hand and seal this ___14th___ day of June 2006.

**Signed, Sealed And Delivered**
**In The Presence Of:**

_____          _____ L.S.

                                 _Eric Cohen_
                                 *(PRINTED NAME)*

                                 _1329 Clyde rd_
                                 _Warminster, PA 18974_
                                 *(HOME ADDRESS OF GUARANTOR)*

GUARANTOR'S SSN: _____

INITIALS:
LANDLORD _____
TENANT _____

48